# Floyd *v.* The State.

### *Indictment for Murder.*

1. *Cross-examination of witness as to former statements, with view of contradicting or impeaching him.*—When it is sought to impeach the credibility of a witness by proving that he has on other occasions made contradictory oral statements, he may be asked, on cross-examination, if he did not make such statements; but, when his former statements were reduced to writing and subscribed by him, as when testifying on the preliminary examination of the defendant before a committing magistrate, and the deposition or writing is produced in court, it must be read to him, or he must be allowed to read and examine it, before he can be interrogated as to his former statements.

2. *Confessions, and independent proof of corpus delicti; presumption in favor of judgment; error without injury.*—While the defendant's confessions, in a criminal case, can not properly be received as evidence until some independent proof of the *corpus delicti* has been adduced, the *prima facie* sufficiency of such preliminary proof is a question for the determination of the court; when the record shows that such proof was adduced, this court would presume, if necessary, that it was introduced before the confessions were offered; and even if it was introduced subsequently, the error in the prior admission of the confessions would be thereby cured.

3. *Testimony of deceased witness.*—The rule is well established, that the testimony of a witness since deceased, given on the preliminary examination of the defendant before a committing magistrate, is admissible as evidence against him on the trial, if it is shown that the witness was sworn by competent authority, and that the defendant had an opportunity to cross-examine him.

4. *Specific and general objections to evidence.*—An objection to evidence on a specific ground is a waiver of all other grounds of objection; and when a specific objection has been made and overruled, and a general objection is afterwards interposed to a part of the evidence, not stating any particular ground, it will be presumed to have been based only on the specific ground already overruled.

5. *Arrest by officer without warrant; flight of accused, and homicide of pursuing officer* —A policeman on duty, or other lawful officer, has authority to arrest, at any time or place. a person whom he knows to be charged with a felony (Code, §§ 4653, 4664), and may pursue and use necessary force, if the accused flees or resists; if he is killed by the

accused while in pursuit, the killing is without excuse or palliation, and the doctrine of self-defense is not available, although the accused may have been innocent of the felony with which he was charged.

6. *Evidence relevant to question of intent or self-defense.*—The deceased, a policeman, having attempted, while on duty, to arrest the defendant, for whom he had no warrant, but who was at the time charged with a felony, and being shot by the defendant while fleeing and pursued; evidence of the pendency of the indictment against the defendant, the forfeiture of his bail-bond, the reward offered for his arrest by his sureties, his acquaintance with the deceased as a policeman, and the knowledge of all these facts by the deceased, is relevant and material, as shedding light on the *animus* of the defendant, and as bearing on the question of self-defense.

7. *Homicide of pursuing officer, by accused fleeing from arrest under mistake as to identity.*—The defendant being under indictment for a felony (not capital), being accosted at night by a policeman, who mistook him for another person, fleeing to avoid arrest, and being pursued by the officer, whom he thereupon turned and shot; charges asked, asserting the doctrine of self-defense because the policeman was pursuing the defendant by mistake for another person, are properly refused.

8. *Abstract or argumentative charge.*—A charge asked, which is either abstract or argumentative, is properly refused.

9. *Charge tending to mislead, or in words subject to criticism.*—A charge given, which asserts a correct legal proposition applicable to the evidence, is not ground of reversal, though it may have a tendency to mislead, or may be subject to criticism on account of its phraseology.

FROM the City Court of Montgomery.

Tried before the Hon. THOS. M. ARRINGTON.

The defendant in this case, John Floyd, a freedman, was indicted for the murder of John R. Pugh, a policeman of the city of Montgomery; was tried on issue joined on the plea of not guilty, convicted of murder in the first degree, and sentenced to the penitentiary for life. The deceased was shot on Saturday night, July 31st, 1886, while in pursuit of a man whom he was attempting to arrest, and who turned and shot as he ran; and he died, from the effects of the wound, several months afterwards. As to the circumstances attending the shooting, it was shown on the trial by the testimony of one Laprade, another policeman, that he and the deceased were out on duty in the northern part of the city, watching especially for one Mose Howard, a freedman, for whom they had a warrant of arrest charging him with a misdemeanor. While sitting on the bridge near the crossing of the lower Wetumpka road with the Eufaula railroad, waiting the return of a messenger whom they had sent out, having halted several negroes as they passed, and asked their names, a man approached them, coming down the railroad track; and being asked his name, answered, "Henry Williams." Pugh then rose to his feet, and said, "*Hold on, Henry, I want to see who you are.*" The man then jumped from the railroad track, and ran, closely pursued by

2

Pugh; and as Pugh was in the act of seizing or striking him, he turned and shot as he ran, and was immediately fired at twice by Pugh. They had then run about fifty yards, and Laprade had gone across to intercept the man at a sharp turn in the road; and he immediately fired at the man, who continued to run, and was about forty or fifty feet distant. The man escaped, and Laprade returned to the assistance of Pugh, who was shot in the bowels. A pistol was found on the ground the next day, which was identified as the property of the defendant. Mose Howard, for whom the policemen had a warrant of arrest, was arrested on suspicion a few days after the shooting; and he was kept in confinement until the arrest of the defendant, some two months or more afterwards. A detective officer, belonging to the police force of the city of Montgomery, was "put on the case," and he kept on the defendant's track, following signs, clues, or suspicious circumstances, until he succeeded in arresting the defendant in Columbus, Georgia, 100 miles distant from Montgomery, nearly two months after the commission of the offense.

The bill of exceptions reserved on the trial purports to set out all the evidence that was adduced, but does not state the order in which it was introduced. The testimony of Laprade is first set out, and the exception reserved by the defendant to the ruling of the court as to the proper practice in cross-examining a witness for the purpose of contradicting or impeaching him; as to which ruling, the opinion states the material facts. The solicitor asked the witness, if the defendant was not acquainted with said Pugh, the deceased, to which the witness answered affirmatively; and exceptions were duly reserved by the defendant to the allowance of this question and answer. The testimony as to the finding of the pistol, and its identification as the property of the defendant, is next set out in the bill of exceptions, after which it thus proceeds: "The State introduced William Pickett, a negro, as a witness, to prove declarations of the defendant on the Sunday morning after the shooting, and relating to it; and asked the witness, if any such declarations were made to him. The defendant objected to the question, on the ground that extra-judicial declarations were not admissible until there was proof of the *corpus delicti* by independent evidence. The court overruled the objection, because there was independent proof of the *corpus delicti*, and allowed the witness to answer the question; to which rulings the defendant excepted." The witness then testified, in substance, that on the Sunday morning after the shooting, about sunrise, the defendant

[Floyd v. The State.]

came to his house on the Hawes place, about three miles distant from the city of Montgomery, and asked him and his wife to dress his left hand, which was wounded and bleeding; and that he told them, while they were dressing his hand, that he had shot a policeman in Montgomery the night before, and that the policeman's mate had then shot his pistol out of his hand and wounded it, he being left-handed. Several other witnesses were introduced by the State, who lived at different distances from the city on the same road, and each of whom testified to an interview or conversation with the defendant, on the same or successive days, in which the defendant related, with more or less detail, the circumstances of his difficulty with the policeman on Saturday night; telling one, that the pursuing policeman was about to strike him with his club when he shot; and another, that he believed the policeman would have killed him, if he had not shot; but the name of the policeman was not mentioned in any of these conversations. The bill of exceptions contains a subsequent recital as follows : "Before closing its case, the State had introduced evidence tending to' show that the death of said Pugh resulted from the wound received by him on the night of said 31st July, and that this occurred in said county before the finding of the indictment."

"The State offered to read in evidence an indictment pending against the defendant in the City Court of Montgomery, charging him with an assault with intent to murder ; and, in connection therewith, the record of the court showing that a forfeiture had been taken against him and the sureties on his bond, and an *alias capias* ordered, which had been issued, and was in the hands of the sheriff at the time the deceased was shot; and in this connection, further, the testimony of one Murphy, a policeman of the city of Montgomery, to the effect that the surety on the defendant's bond had offered him a reward for the arrest of the defendant, and that he had informed said Pugh and Laprade of this fact." The defendant objected to the admission of each part of this evidence, on the ground that it was irrelevant, immaterial, and related to another distinct prosecution against him ; and he duly excepted to the overruling of his several objections.

The defendant reserved other exceptions to the rulings of the court on the admissibility of evidence, which require no special notice, as the facts appear in the opinion of the court.

The court charged the jury, on request of the State's solicitor, as follows : "If the jury believe from the evidence,

[Floyd v. The State.]

beyond a reasonable doubt, that the defendant was met in Montgomery county, before the finding of this indictment, by policemen Pugh and Laprade, and gave a wrong name when accosted by them ; and that Pugh afterwards pursued him, and defendant shot said Pugh to avoid arrest by him ; and that the defendant was at that time under indictment for a felony, and there was a *capias* out for his arrest, and the officers knew these facts ; then they must convict the defendant of murder, if the shot killed Pugh ; and if they further find that the defendant fired pursuant to a formed design to take life, although the design was formed but an instant before the shooting, the defendant would be guilty of murder in the first degree."

The defendant excepted to this charge, and also to the refusal of each of the following charges asked by him :

"1. If the jury believe, from the evidence, that the defendant had a reasonable fear of great bodily harm to him, and a belief that he could not further retreat without such injury at the hands of the deceased, then they must acquit the defendant.

"2. If the jury believe, from the evidence in this case, that the defendant had a reasonable apprehension of great personal violence, involving imminent peril to his life or limb, then he had the right to protect himself, even at the expense of his assailant's life, if such protection could not be otherwise secured.

"3. If the circumstances surrounding the defendant, at the time of the killing, were such as to impress his mind with a reasonable belief that his life was in danger, or that there was imminent danger of great bodily harm, then the jury must acquit him.

"4. If the jury believe, from the evidence, that the necessity for taking the life of the deceased was not real, but was apparent only to the defendant, on a reasonable belief, formed in his mind from the united or joint attack of Pugh and Laprade on him, and the belief that he could not further retreat without endangering his own life, or exposing himself to grievous bodily harm, then the jury must find the defendant not guilty.

"5. A weak-minded man, honestly believing his own life in imminent danger from his assailant, and who takes life under such belief, though the necessity should not in fact exist, and having retreated as far as he believed he could with safety to himself, should be excused and acquitted by the jury.

"6. If the evidence shows that the defendant was at times subject to fits of depression, fear and great mental

weakness, causing him to run or retreat when in danger, or apparent danger ; then the reasonable belief of the necessity which would be required of a strong-minded man, to excuse the slaying of his assailant, would not be required of the defendant as a weak-minded man, to whom such belief, though seeming to him reasonable, is deceptive.

"7. If the evidence shows that the deceased was pursuing the defendant, even as an officer, under a mistaken idea as to the man, having a deadly weapon and a club, though he had a warrant for the arrest of another person for a misdemeanor, it would have been murder, if the officer had slain the person thus fleeing ; and this would furnish the test of the right of self-defense, should the party fleeing deem the necessity great enough to slay the assailant, in the protection of his own life, or to secure himself from great bodily harm.

"8. To kill another by mistake, while seeking to prevent a reasonably suspected felony, although in fact no felony is intended or about to be perpetrated, is manslaughter, or misadventure, according to the degree of caution used, and the probable ground for believing a felonious intent on the part of the person slain ; as where an officer, early in the morning, pushed abruptly and violently into a gentleman's room, in order to arrest him, not telling his business, nor using words of arrest, and the gentleman, not knowing that he was an officer, under the first surprise took down a sword, and stabbed the officer, killing him, would, as to the principle involved as applied to this case, be excusable homicide."

W. P. CHILTON, for the appellant.

THOS. N. McCLELLAN, Attorney-General, for the State.

CLOPTON, J.—Defendant's counsel claimed the right to ask a witness, with a view to his contradiction, what he testified as to certain matters on the preliminary trial before the committing magistrate ; and after the witness answered, to read his previous testimony as to such matters to the jury. The evidence of the witness given before the magistrate had been reduced to writing, and was in the possession of the examining counsel. The court ruled, that the proper mode of examination was to read to the witness his testimony on the preliminary trial, and ask him if he did so testify. The general rule is well settled, that a witness can not be impeached by proof of contradictory statements made under oath or otherwise, without first laying a proper

predicate by calling his attention to the time, place, and person, and stating to him the substance of what it is proposed to show he had said. The rule applies to written statements made by the witness, the purpose being to afford full opportunity to explain the apparent or alleged inconsistency. When it is sought to impeach the credibility of a witness by proving that he has on other occasions made contradictory *oral* statements, he may be asked on cross-examination if he did not make such representations; but, when the statement is in writing, made by the witness, or subscribed by him, the writing, being the best evidence, should be produced, and an opportunity allowed the witness to inspect and examine. The written testimony of a witness before the committing magistrate can not be read to the jury on the final trial, to contradict him, unless it is produced and shown, or read to the witness, or its absence accounted for, and his attention called to the inconsistent statements, to enable him to show, by comparison of the whole of his previous evidence, that the apparent variance is not real, but modified or explained by other parts of the writing, or to explain otherwise the circumstances, nature, and meaning of what he testified.—*Powell v. State*, 19 Ala. 577 ; *Wills v. State*, 74 Ala. 21 ; *Phoenix Ins. Co. v. Moog*, 78 Ala. 310.

2. It appears from the bill of exceptions that there was evidence of the *corpus delicti;* but it does not appear whether or not its introduction preceded the admission of the con-fessions. If necessary to sustain the ruling of the court, we would presume, in this state of the record, that some preliminary proof was made before the confessions were offered. But the court overruled the objection to the admissibility of the confessions, on the ground, that " there was independent proof of the *corpus delicti;*" the *prima facie* sufficiency of which is for the determination of the presiding judge. Moreover, if it be conceded, that the confessions were inadmissible when offered, they were rendered admissible by subsequently showing the *corpus delicti*, and the error was thereby cured.—*Griffin v. State*, 76 Ala. 29.

3. The court admitted, against the objection of defendant, the testimony of two deceased witnesses, who were examined on the preliminary trial before the committing magistrate. The rule is well established, that such evidence is admissible in a criminal case, on the final trial, when the witness was sworn by competent authority, and the accused had the right to cross-examine.—*Davis v. State*, 17 Ala. 354; *Tharp v. State*, 15 Ala. 749 ; *Harris v. State*, 73 Ala. 495.

4. The *specified* ground of objection is, that the defend-
VOL. LXXXII.

ant had no opportunity of cross-examination. This ground is disproved by the record, which expressly states, that the accused was present at the preliminary trial, was represented by counsel, and cross-examined the witness. Had the effort to exclude stopped here, the defendant, under our rulings, would be regarded as having waived all grounds of objection, other than the particular grounds specified.— *Jacques v. Horton*, 76 Ala. 238. After this objection was overruled, and the testimony of the deceased witness was read to the jury, the defendant made a general motion to exclude the evidence of *one* of them, without stating any particular grounds of objection. The majority of the court are of opinion, that, under the circumstances, it was incumbent on the defendant to have stated the grounds of the motion, if it was intended to base it on any other than the particular ground specified when objection was first made ; and having failed to do so, that the motion to exclude should be referred to such previously specified ground, and all others regarded as waived. Though I doubt the propriety of extending the implied waiver to the subsequent motion, the court not having required specific objections to be stated, it being a question of practice, I acquiesce in the opinion of the majority. This renders it unnecessary to consider the legality of the testimony in other respects.

5-6. The evidence of the pendency of the indictment charging defendant with a felony, the forfeiture of his bail-bond, the issue of a *capias*, and the reward offered by his sureties for his arrest, in connection with a knowledge of these facts on the part of deceased, and defendant's acquaintance with him, become material and relevant, as shedding light on the *animus* of defendant, and as bearing on the issue of self-defense. The deceased was a policeman of the city of Montgomery, and was on duty. As such, he had statutory authority, and it was his duty, to arrest defendant, who was charged with a felony, on any day, and at any time, though he may not have had a warrant.—Code of 1876, §§ 4653, 4664. To submit to an arrest, under such circumstances, was the correlative duty of defendant. If he fled to avoid arrest, the deceased had a right to pursue him, and to use the force necessary to compel submission. Resistance, in such case, is criminal ; and innocence of the charge affords no excuse. If the defendant attempted to escape by flight, and shot the deceased while pursuing him, knowing that he was an officer, in order to prevent his arrest, the killing is without excuse or palliation. Under such circumstances, the defendant is not free from fault in bringing the

necessity on himself, which we have uniformly held is an essential element of the doctrine of self-defense.

7.   When considered in reference to the tendencies of the evidence, all the charges asserting the right of self-defense are fatally defective, and were properly refused.   They assume that defendant had the right to flee, and that deceased had no authority to pursue, on any hypothesis of the facts which the evidence tends to support.   They pretermit inquiry, whether the defendant was at fault in not submitting to arrest, and by flight producing the necessity of pursuit, and apparently threatening attitude of the pursuing officer ; and they withdraw from consideration the evidence tending to show that the purpose of deceased was to arrest, and that the defendant ought to have so understood.   And on the hypothesis of one of the charges, that the deceased, having a warrant for the arrest of a different person charged with a misdemeanor, was pursuing the defendant with a club and deadly weapon under a mistake as to the man, and conceding that it would have been murder if the deceased had slain the defendant thus fleeing, this would not furnish the legal test of the right of self-defense, though the defendant deemed the necessity sufficient to slay the deceased to save himself from great bodily harm.   Whatever the defendant may have deemed, the plea of self-defense is not sustained, unless the facts established show a reasonable ground to believe that there was a *present* real or apparent necessity.—*Dupree v. State,* 33 Ala. 380.

8.   Charge number 8, requested by defendant, is both abstract and argumentative.   There is no evidence, even remotely, tending to show that the killing was by mistake, while seeking to prevent a reasonably suspected felony.

9.   If, as hypothetically stated in the charge given at the request of the prosecution, the defendant was under indictment for a felony, and a *capias* had been issued for his arrest, of which facts deceased and his co-policeman were informed, and, on being met and accosted by the officers, the defendant gave an assumed name, and, on being pursued, shot the deceased to prevent arrest, which shot caused his death, the defendant is guilty of murder ; and he is guilty of murder in the first degree, if he shot in pursuance of a formed design to take life.   While the charge, abstractly asserting a correct legal proposition, will not work a reversal, it may be remarked that the phraseology, in the light of the evidence, is subject to criticism, as being calculated to mislead, which tendency should be avoided.   A formed design may be general, as carrying a deadly weapon with the intention to use it on a difficulty arising with any

[Jenkins v. The State.]

person, irrespective of a necessity, real or apparent; or special, directed against a particular individual. It implies some preparation to execute the design.—*Mitchell v. State*, 60 Ala. 26. Had there been evidence that the defendant procured or carried the pistol with the purpose to use it if any person undertook to arrest him, the charge would have been literally and strictly accurate; but, in the absence of such evidence, it is safer and better to employ the statutory words, defining the characteristics of murder in the first degree—"willful, deliberate, malicious, and premeditated,"—the duration, whether long or brief, of deliberation or premeditation, being immaterial.

There is no error in the rulings of the court not specially noticed.

Affirmed.