# Kennedy *v.* The State.

*Indictment for Murder.*

1. *Relevancy of evidence as to uses and capacity of lamp.*—The defendant having shot and killed the deceased while travelling by night as passengers on a railroad train, and claiming that he acted in self-defense—that the deceased had assaulted, and was choking him; and the conductor of the train having testified, on the part of the prosecution, that he examined the defendant's throat, on complaint that it hurt him, but saw no mark or sign of injury on it; he may state the uses to which his lantern, used in making the examination, was applied —that it "was used for all purposes, to see in the dark, to examine tickets, money, &c."

2. *Exculpatory declarations of defendant; admissibility of.*—The exculpatory declarations of the defendant himself, after the shooting, are not admissible as evidence for him, unless shown to be so closely connected with the act as to constitute a part of the *res gestæ.*

3. *Former statements of witness under oath; cross-examination as to.*— The testimony of a witness, on the preliminary examination of the

[Kennedy v. The State.]

defendant before a committing magistrate, having been reduced to writing and subscribed, and being produced in court on the trial, he can not be cross-examined as to particular parts, or garbled extracts from it, without allowing him to read or hear the entire deposition; nor can the deposition itself be treated as original evidence, or received for any other purpose than that of contradicting or impeaching the witness, and the court may so instruct the jury.

4. *Dying declarations; charge as to.*—Dying declarations are received as evidence, though not made under oath, because the danger of impending death is deemed equivalent to the sanction of an oath; and the court may instruct the jury that such declarations are to be considered by them "just as though the deceased had been sworn and put on the stand, and had testified to the words used."

5. *Charge as to constituents of murder.*—A charge instructing the jury that if the defendant, "when he saw the deceased on the train, on purpose, and without any circumstances of mitigation or justification, pulled out his pistol and shot him, this would be a willful and deliberate murder," is not erroneous.

6. *Insulting words, or recent provocation, as reducing homicide to manslaughter.*—Insulting words used by the deceased, or recent provocation, can not avail to reduce the killing from murder to manslaughter, when no assault was committed, and a sufficient cooling time intervened; nor when the defendant himself sought or brought on the difficulty.

7. *Charge on part of evidence, ignoring material qualifying facts.*—A charge asked in a criminal case, based on certain facts hypothetically stated, which there is evidence tending to prove, but ignoring other material qualifying facts, which the evidence also tends to prove, is misleading, and therefore properly refused.

FROM the Circuit Court of Escambia.

Tried before the Hon. JOHN P. HUBBARD.

The defendant in this case, Charles Kennedy, was indicted for the murder of William E. Perry, by shooting him with a pistol; was convicted of murder in the first degree, and sentenced to the penitentiary for life. The killing occurred on a railroad train running from Mobile to Montgomery, on which both the defendant and the deceased were travelling. The deceased and a companion were drinking freely, and had a bottle of whiskey, which they offered to several persons in the car, and among them the defendant, who declined to drink. Some conversation then passed between them, in which, as the defendant testified in his own behalf, the deceased used words abusive of his step-father, mother and sister; but there was no other testimony as to this conversation. Soon afterwards the defendant left his seat, remarking to one McCarron, a quarantine officer who was in the car, "Those two men are going to raise a fuss with some one," went into the baggage car, got a pistol, which he had seen placed in a pigeonhole by one of the railroad men, and returned into the car which he had left, taking a seat on the side opposite to the deceased. The deceased soon arose from his seat, and going

to the seat occupied by the defendant, as the witnesses for the prosecution testified, placed his hands on the arm or back of the seat, saying to defendant, "*You seemed to get mad at what I said;*" to which defendant replied, "*Go away, go away,*" and immediately fired the fatal shot. A witness for the defendant testified, that the deceased, on going to the defendant's seat, "put his hands on defendant's shoulders, standing in front of him;" while the defendant himself testified, that the deceased put his hands on his shoulders, "pressed his thumbs into his windpipe, and was choking him to death;" and he complained to the conductor and others, after the shooting, that his neck was hurt, though they saw no bruises or marks.

. The defendant requested the following charges in writing, and duly excepted to their refusal:

(1.) "If the jury believe from the evidence that Perry said to defendant that his mother 'was no good,' and that her daughter 'was a bastard;' and that defendant made no reply; and that Perry thereafter went to defendant's seat, and said to him, 'What I said to you seemed to have insulted you,' or 'made you mad;' and if they further believe from the evidence that Perry made an assault upon the person of the defendant in a rude and angry manner; and that the defendant, being inflamed by the abuse heaped by Perry on his mother, and by the assault made on him by Perry, if any assault was made, and in the transport of passion aroused by these facts, shot; and that the shot was by reason of a sudden and overruling transport of passion, occasioned by the language of Perry as to his mother, if any is shown, and the assault on him by Perry, if any is shown, and was not of malice aforethought; then the defendant could not be guilty of any thing higher than manslaughter in the first degree."

(2.) "If the jury, after considering carefully and cautiously all the testimony in the case, including the testimony of the defendant himself, are reasonably satisfied that he fired the fatal shot under a sudden transport of passion produced by what Perry said and did to him, and not from malice aforethought; then they can not find the defendant guilty of any thing higher than manslaughter in the first degree."

(3.) "If the jury believe from the evidence that Perry said to defendant that his mother 'was no good,' and that her daughter 'was a bastard;" and that Perry shortly thereafter went to the seat where defendant was sitting, and said to him, 'It seems what I said to you made you mad,' and

put his hands on defendant in a rude and angry manner; and that defendant did nothing to provoke or bring on the difficulty; and that what Perry said and did to him, if he said or did anything, so enraged and exasperated defendant as to arouse in him such a sudden and great passion as to dominate his will, and for the moment overpower his reason; and that he fired the fatal shot under this transport of passion, and not from malice aforethought; then he can not be convicted of any higher offense than manslaughter in the first degree."

(4.) "If the jury believe from the evidence that the defendant made no approach to the deceased, either in words or deeds, which would or could make the deceased mad, or hurt his feelings; and that Perry alone used insulting words, and advanced or went to where the defendant was sitting, and there assaulted him, or attempted in a rude and angry manner to touch his person, or in a rude and angry manner touched his person; and if they further believe from the evidence that the defendant's passions were greatly aroused by what the deceased said and did, if he said and did any thing, which passion for the time being dominated the will, and overpowered the reason of the defendant, and he fired the fatal shot under the influence of this passion, and moved thereby, and not with malice aforethought; then they can not find him guilty of any higher offense than manslaughter in the first degree."

(5.) "If the jury believe from the evidence that Perry used insulting words to the defendant, and the defendant acted upon these words; and that he did not provoke the words used by Perry, if he used any; the jury may weigh these words, together with the other evidence, in determining the degree of murder of which the defendant is guilty, if he is guilty of murder in either degree."

Exceptions were reserved to other rulings, which will be understood from the opinion of the court.

JOHN GAMBLE, for appellant.

THOS. N. McCLELLAN, Attorney-General, for the State.

SOMERVILLE, J.—The defendant is indicted for shooting and killing one Perry with a pistol, while travelling on a train of cars between Mobile and Montgomery. He claimed that the deceased had used insulting words towards him, and had assaulted him, inflicting a slight wound on his

neck.   The witness Elliott, upon the defendant's complain-
ing that his throat hurt him just after the killing, made
examination of the place in the night time, using for this
purpose a lantern.   He was asked by the solicitor, what he
was accustomed "to use the lantern for"; to which he re-
plied, that he used it "for all purposes—to see in the dark,
to examine tickets, and money, &c.", he being the conductor
on the train.   This question and answer were objected to by
defendant, and overruled by the court.   In this, we think,
there was no error.   The uses to which the lamp was ordi-
narily put, tended to show the uses to which it was adapted,
and in this manner explained the capacity or candle-power
of the light.   If it was suitable to examine money and
tickets in the dark, the jury might well infer that it was
equally suitable for the examination of the alleged injury
on the defendant's neck, which was the use to which the
witness had put it, and in reference to the results of which
he was undergoing examination.

This witness is shown not to have been present at the
time of the shooting, he being then in another coach.
Upon receiving information as to the difficulty, he went into
the car where it had occurred.   How many minutes this
was after the killing, the bill of exceptions fails to disclose.
In view of this state of the evidence, the court properly
sustained an objection by the State to the question pro-
posed to the defendant, "*What did he say ?*"   The answer
of the defendant, conceding that it would have reference to
the homicide, is not shown to be so closely connected with
the main transaction—the act of shooting—as to constitute
a part of the *res gestæ*.   We can not know from the record
that it would not have been narrative merely of a by-gone
transaction.   To authorize the admission of such evidence,
it must be shown to be "contemporaneous" with the main
transaction, in the sense in which we have heretofore ex-
plained this term, and upon which we need dwell at no
length at this time.—*Ala. Gr. So. R. R. Co. v. Hawk*,
72 Ala. 112; s. c., 47 Amer. Rep. 403; *Dismukes v. State*,
83 Ala. 287; *Burns v. State*, 49 Ala. 370.   The same ob-
jection applies to the other questions seeking to elicit from
the witness Elliott any declarations made by the defendant
subsequent to the killing, and relevant to it.

The testimony of the witness McCarron, taken before the
magistrate on the preliminary investigation of the facts
attending the killing, having been reduced to writing, the

court did not err in refusing to allow him to be cross-examined as to garbled extracts taken from the writing, with a view of contradicting or impeaching him. The court properly required that the entire writing should be shown, or read to the witness, and go to the jury.—*Wills v. The State*, 74 Ala. 21; *Gunter's case*, 83 Ala. 96. Nor was the charge of the court to the jury erroneous, that the paper should not be treated as original evidence of the facts of the case, nor be received for any other purpose than that of contradicting or impeaching the witness.—*Jones v. Pelham*, 84 Ala. 208. The paper was entire and not severable, and it was impracticable to admit a part of it to go to the jury. The practice in such cases is to admit the entire paper, and limit its effect as evidence by a proper charge to the jury, as was done by the Circuit Court on the trial in this case, *Wills v. State*, 74 Ala. 21, *supra*.

Exception is taken to the charge of the court touching the dying declarations of the deceased, as to the circumstances of the homicide. This charge was, that these declarations were to be considered by the jury, "just as though deceased *had been sworn* and put on the stand, and testified as a witness to the words used in his dying declaration." This charge is liable, as we readily see, to a construction which would render it erroneous; but it is equally capable of being so construed as to make it announce a correct proposition of law. It does not necessarily instruct the jury as to the degree of weight to be given such declarations; nor does it ignore the principle, that such evidence is to be received with caution, and weighed with care. in view of the fact that the accused had been deprived of the power of cross-examination; or that the circumstances of the killing may have been attended by confusion and surprise, calculated to prevent close observation; or that the passions of anger and revenge may have biased the accuracy of the statements; or other like considerations, which tend to lessen the weight of this kind of evidence. The charge was especially intended to have relation to the element of weakness often urged against dying declarations, by reason of the fact that the witness was not *under oath* at the time of the statement. The rule on this subject is thus stated by Mr. Greenleaf: "The persons whose declarations are thus admitted, are considered as standing in the same situation as if they were sworn; the danger of impending death being equivalent to the sanction of an oath."—1 Greenl. Ev.

§ 157. And again: "A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice."—§ 156. The same proposition is asserted in *Sylvester v. State*, 71 Ala. 18. If the charge in question was ambiguous, so as to be susceptible of the interpretation sought to be placed on it by appellant's counsel, this misleading tendency could have been corrected by an explanatory charge, had it been requested by the accused. It can not, for this reason, operate to reverse the judgment.

There is no error in the charge given by the court, to the effect that if the accused, when he saw the deceased on the train, "*on purpose*, and without any circumstances of mitigation or justification, pulled out his pistol, and shot deceased, this would be a willful and deliberate murder." A pistol is a deadly weapon, from the use of which malice may be implied; and a killing with a deadly weapon, without more, is presumptively murder. If there were no circumstances of justification or excuse, the killing could not have been in self-defense. If there were no mitigating or extenuating circumstances, it could not be reduced to manslaughter, nor could it have been lawful.

It is earnestly urged that the Circuit Court erred in refusing to give severally the five charges requested by the defendant, the legal effect of each of which, if given, would have been to reduce the killing from murder to manslaughter. Upon a close scrutiny of these charges, we are satisfied that their tendency was to mislead the jury. The theory upon which they are based is, that the killing of deceased by the accused was reduced to the grade of manslaughter in the first degree, because prompted by sudden heat of passion, excited by *recent* and *reasonable* provocation, such as rebut the existence of malice, or formed design in the act of killing. The evidence tended to show three important facts, touching this inquiry: (1.) That the insulting words used by deceased to defendant, had been uttered a considerable time before the killing—an interval allowing the defendant to get up and go to another coach in the train, arm himself with a pistol, and return. This may have been a sufficient interval for "cooling time" in the passions of the accused excited by the insult. (2.) One phase of the evidence tended to show, that the deceased made no assault whatever on the accused— that he spoke to him merely without putting his hands on him, or threatening to do so. If this be true, the provoca-

tion could not have been adequate to reduce the killing to manslaughter (3.) There was evidence tending to prove that the accused armed himself, and by his own conduct brought on the difficulty, by putting himself in the way of being attacked by Perry, the deceased. Each one of these charges is defective in ignoring one or more of these phases of the evidence, and in excluding its consideration from the jury as a qualifying factor in determining the nature or character of the homicide. If the defendant had time to cool under the smart of the alleged insulting words, they could not be considered in connection with any subsequent act of assault on him by the accused; and standing alone, they could not reduce the homicide to manslaughter. So, if there was no assault and battery by the deceased on the accused, either perpetrated or threatened, the provocation could not be adequate to rebut the malice presumed from an inexcusable killing with a deadly weapon. And if the killing was executed pursuant to a previously formed design, which necessarily implies malice, it could not be imputed to spring from that sudden heat of passion which dethrones the reason. An examination of these charges shows that, in view of these principles, each of them was more or less misleading, and that they all were properly refused.—*Stewart v. The State*, 78 Ala. 436; *Smith v. State*, 83 Ala. 26; *Williams v. State*, *Ib.* 16; *Fallin v. State*, *Ib.* 5; Clark's Man. Crim. Law, §§ 419–422.

We discover no error in any of the rulings of the Circuit Court, and the judgment must be affirmed.