**HUMBER v. STATE. (5 Div. 451.)**

(Court of Appeals of Alabama. June 30, 1923. Rehearing Denied Oct. 30, 1923.)

**1. Criminal law ⬅471—Physician's testimony as to direction from which shot was fired held inadmissible.**

In a murder prosecution, a medical expert's testimony that, in his opinion, the shot was not fired from the front, held inadmissible, being an inference from facts requiring no peculiar skill or particular fitness to solve.

**2. Criminal law ⬅363—Rule stated as to when declarations admissible as "res gestæ."**

Acts and declarations, to be admissible as res gestæ, must be contemporaneous with the main fact and so closely connected with it as to illustrate its character.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Res Gestæ.]

**3. Criminal law ⬅366(6)—Declarations of deceased to attending physician held inadmissible as res gestæ.**

Declarations of deceased to a doctor, who had gone from his home to that of deceased to attend the latter after the shooting, held not so intimately connected therewith in time as to constitute part of the transaction or illustrate its character.

**4. Homicide ⬅200—Essentials to admissibility of dying declarations stated.**

It is essential to admissibility of dying declarations that declarant was in actual danger of death when they were made, that he fully apprehended his danger, and that death ensued.

**5. Homicide ⬅214(2)—Dying declarations must relate to killing, and are admissible to prove relevant facts to which deceased could have testified.**

Dying declarations must relate to the facts and circumstances of the shooting, and are admissible to prove any relevant fact, within the res gestæ, to which deceased could have testified, if living.

**6. Homicide ⬅214(3)—Declarations of deceased as to his suffering held inadmissible as dying declarations.**

Declarations of deceased to an attending physician that "I want some hot clothes laid over my stomach," "I am hurting so bad," etc., held inadmissible as dying declarations not relating to the facts of the shooting, but to deceased's suffering and desire for relief from pain.

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**7. Homicide ⬦338(2)—Error in admitting declarations of decedent as dying declarations held harmless.**

Error in admitting declarations as to deceased's suffering and desire for relief from pain as dying declarations *held* harmless.

**8. Homicide ⬦214(1)—Dying declarations held inadmissible.**

Testimony as to dying declarations by deceased "that he wanted me to remember" that "she shot me like a dog," etc., *held* inadmissible.

**9. Homicide ⬦325—Objections to dying declarations cannot be first raised on appeal.**

Objections to dying declarations cannot be first raised on appeal.

**10, Witnesses ⬦387—Witness cannot be cross-examined as to parts of previous testimony without opportunity to read or hear entire. testimony.**

A witness cannot be cross-examined, for impeachment purposes, as to particular· parts or extracts of his testimony on preliminary examination, without allowing him to read or hear the entire deposition.

**11. Criminal law ⬦448(3)—Witness may testify as to enmity or ill feeling between parties.**

Enmity or ill feeling between parties is a fact to which a witness may testify, if observant of and familiar with their intercourse and the state of their feelings as shown by their conduct and conversation.

**12. Homicide ·⬦166(1)—Testimony as to friendly relations between defendant and deceased held admissible.**

In a· prosecution of a wife for murdering her husband, testimony that the relations between them had been good for years *held* admissible ·as tending to show absence of a motive for the killing and to illustrate the parties' conduct at the time.

**13. Criminal law ⬦438—Photographs of room in which shooting occurred held admissible.**

In a. murder prosecution, photographs of the room in·which the shooting occurred *held* admissible.

**14. Criminal law ⬦432—Unintelligible writings properly excluded.**

Fragmentary unintelligible and meaningless writings *held* properly excluded.

**15. Homicide ⬦158(1)—Paper containing threat by decedent to kill defendant held admissible.**

In a murder prosecution, a fragmentary paper, in deceased's handwriting, containing defendant's name and a threat to kill her, *held* admissible.

**16. Homicide ⬦300(13)—Charges on self-defense and accidental shooting during scuffle properly refused as pretermitting defendant's freedom from fault.**

In a murder prosecution, charges on self-defense and accidental shooting, during a scuffle for possession of a pistol fired by deceased at defendant following a threat to kill her, *held* properly refused as pretermitting defendant's freedom from fault in bringing on the difficulty.

**17. Criminal law ⬦763, 764(14), 811(2)— Charges that jury must consider certain evidence held properly refused ̃as argumentative, invading jury's province and emphasizing certain facts.**

In a murder prosecution; charges that the jury, in determining whether the pistol was fired during a scuffle in an effort to prevent deceased from shooting defendant, must consider a letter containing a threat to kill defendant, written by deceased, for the purpose of ascertaining the condition of his mind, *held* properly refused as argumentative, invading the jury's province and giving undue prominence to certain facts.

**18. Homicide ⬦300(4), 304—Argumentative requests for instructions properly refused.**

In a murder prosecution charges on self-defense and accidental shooting argumentative in character are properly refused.

**19. Criminal law ·⬦755½—Instructions invasive of province of jury properly refused.**

Requests for instructions, in a murder prosecution, on self-defense and accidental shooting, *held* properly refused as invading province of jury.

**20. Homicide ⬦300(6), 304—Instructions giving undue prominence to specific facts properly refused.**

In a murder prosecution requests for instructions on self-defense and accidental shooting *held* properly refused as giving undue prominence to certain facts.

**21. Homicide ⬦286(2)—Charge on malice held properly refused as misleading and incorrect.**

A charge that malice, as applied to murder cases, is the killing of a human being without legal justification, excuse, or extenuation, that it is an inferential fact, which may be inferred from intentional use of a deadly weapon, but that it could not be presumed from such use of a deadly weapon in self-defense, *held* properly refused as misleading and incorrect.

**22. Criminal law ⬦720(9)—Argument of state's counsel held legitimate.**

Argument of state's counsel that, under defendant's theory of self-defense and accidental shooting in a scuffle for possession of a pistol fired at her by deceased immediately·following a threat to kill her, threats contained in a letter written by deceased had no probative force, *held* legitimate.

**23. Criminal law ⬦925½(1)—Presence in jury room of photographs not in evidence held not ground for new trial.**

The presence in the jury room of photographs not in evidence, which were picked up and placed by ̃mistake, for which neither party was responsible, with other photographs, which were in evidence, *held* not a ground for new trial, in the absence of any affirmative showing of prejudice.

Appeal from Circuit Court, Russell County; J. S. Williams, Judge.

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Leila C. Humber was convicted of murder in the second degree, and appeals. Reversed and remanded.

Certiorari denied by Supreme Court in Ex parte State, ex rel. Atty. Gen., in re Humber v. State, 210 Ala. 559, 99 South. 73.

On the trial the state, over objection of defendant, introduced in evidence the photographs marked Exhibits A, B, C, and D, showing four views of the room in which the shooting occurred.

The following requests for charges were refused to the defendant:

"K. In the case if the jury believe from the evidence that Mrs. Humber entered the room where Mr. Humber was, and if they believe from the evidence that she was about the door entering the hall, that Mr. Humber slammed the shutter of the door ahead of her and said, 'You damn heifer, I am going to kill you,' and presented the pistol and fired, and if you further believe from the evidence that Mrs. Humber rushed up and seized Mr. Humber and scuffled with him for the pistol and that pistol was fired in the scuffle, whether by Mr. Humber or Mrs. Humber, and you further believe from the evidence that Mrs. Humber was endeavoring to prevent Mr. Humber from shooting her and the pistol was fired in such effort then the jury must find defendant not guilty.

"N. The court charges the jury that the defense in this case insists that Lucius F. Humber had a pistol in his hand and that he said to defendant, 'I am going to kill you, you heifer,' and that he fired at her, and that she rushed upon the said Lucius F. Humber and grappled with him for the pistol and that in the scuffle the pistol was fired, and that all she did was done to prevent the said Lucius F. Humber from shooting defendant and in determining whether 'or not the above insistence is true the jury must take into consideration the letter offered in evidence of May 17, 1922, and its contents, if the jury believe from the evidence that L. F. Humber wrote said letter, and this for the purpose of ascertaining the quality of the mind of said L. F. Humber and whether or not it is probable that the said L. F. Humber made the assault upon defendant.

"O. The court charges the jury that, if at the time Mrs. Humber went into the room where L. F. Humber was, he presented a pistol at her and said, 'I am going to kill you,' and fired at defendant, then the defendant had the right to make an effort within her power to prevent L. F. Humber from killing her or of visiting great bodily harm upon her, and if the jury believe from the evidence that the defendant did no more than she honestly believed was necessary under the attending circumstances to save herself from harm, then the jury must find defendant not guilty.

"P. The court charges the jury that the defense in this case in one phase is that of self-defense, and if the jury find from the evidence that when Mrs. Humber entered the room where L. F. Humber was, he presented a pistol at defendant and fired at her, and if at that time defendant rushed upon deceased and grappled with him for the pistol and if the defendant and deceased scuffled for control of the pistol and the pistol was fired in such scuffle and the deceased was killed in that way and not by any intention on part of defendant to take the life of deceased, then the defendant must be acquitted.

"R. The court charges the jury that if the jury believe from the evidence in this case that, when the defendant entered the room where Lucius F. Humber was, he (the said Lucius F. Humber) presented a pistol and said to defendant, 'I am going to kill you,' and fired at defendant, and she (the defendant) rushed up to Lucius F. Humber and grappled with him for the pistol with the purpose to prevent said L. F. Humber from shooting her, and that in the grapple for it, the pistol was fired and Lucius F. Humber was killed during such grapple for the pistol, then the jury must find the defendant not guilty.

"S. The court charges the jury that if the jury, after fair consideration of all the evidence, believe from the evidence that the following were the attending circumstances in this case, viz. that the deceased, Lucius F. Humber, was in his room, that defendant entered his room and was passing through, and that as she approached the door leading into the hall the said Lucius F. Humber appeared and shut the door and presented a pistol and said, 'I am going to kill you,' and fired at the defendant and that the defendant rushed to deceased and struggled with him for the pistol to prevent him from shooting her (the defendant) and that in struggling for the pistol it was fired, whether by defendant or by deceased, the jury must acquit defendant.

"T. The court charges the jury that malice as applied to cases of murder is in law the killing of a human being without legal justification, excuse or extenuation; that malice is an inferential fact and is inferred from facts and circumstances positively proven and may be inferred from the intentional use of a deadly weapon, but malice as an ingredient of murder cannot be presumed from intentional use of a deadly weapon when the same is used only in self-defense, as self-defense has been defined and charged to you by the court."

N. D. Denson &, Sons, of Opelika, and Frank M. de Graffenried, of Seale, for appellant.

Uncommunicated threats, recently made, were admissible to show who was probably the assailant. Roberts v. State, 68 Ala. 156; People v. Scoggins, 37 Cal. 677; Wharton's Cr. Ev. § 757; Trapp v. New Mexico, 225 Fed. 968, 141 C. C. A. 28. A witness may be impeached in a criminal case by proof of contradictory statements made on preliminary hearing. Payne v. State, 60 Ala. 80; Jones v. State, 145 Ala. 51, 40 South. 947; Bigham v. State, 203 Ala. 162, 82 South. 192. Dying declarations are only admissible in proof of material issues. Gissendanner v. State, 18 Ala. App. 199, 89 South. 835; Pilcher v. State, 16 Ala. App. 237, 77 South. 75; Le Nier v. State, ante, p. 227, 96 South. 459; Sanders v. State, 2 Ala. App. 13, 56 South. 69. It was error to permit the witness Dr. Elrod to testify that a bullet was not fired from the front. Bennett v. State, 52 Ala. 370; McKee v. State, 82 Ala. 32, 2 South. 451; Noble v.

State, 14 Ala. App. 9, 70 South. 187; Rigell v. State, 8 Ala. App. 55, 62 South. 977.

Harwell G. Davis, Atty. Gen., Lamar Field, Asst. Atty. Gen., and J. R. Terrell, of Greenville, for appellee.

There was no error in permitting expert testimony as to the relative positions of parties shooting. Pynes v. State, 207 Ala. 414, 92 South. 666. The burden is on defendant to show that the jury considered and were prejudiced by photographs improperly before the jury. Leith v. State, 206 Ala. 439, 90 South. 687; Wigmore on Ev. § 1920; Mathis v. State, 15 Ala. App. 248, 73 South. 122; Dumas v. State, 159 Ala. 42, 49 South. 224, 133 Am. St. Rep. 17; Rigell v. State, 8 Ala. App. 46, 62 South. 977; Roden v. State, 13 Ala. App. 105, 69 South. 366; 5 Ency. Ev. 588. Unintelligible fragments of letters were properly excluded from the jury.

FOSTER, J. The defendant, appellant, was convicted of murder in the second degree. The deceased, Lucius F. Humber, and the defendant, Leila C. Humber, at the time of the killing, were husband and wife. They had both been previously married, and they both had children by their first marriage. They had two children by their marriage, a girl about eleven years of age and a boy eight years of age at the time the killing occurred. They were living in Girard, Russell county, Ala. Their home was about a mile or two from the city of Columbus, Ga., in which city the deceased was doing business with his associate in the name of Blanchard, Humber & Co.

At the time of the killing, the two children of defendant and deceased lived with them, and a son of the defendant by a former marriage, who had been sick, was in the home with them. They also had a cook and a chauffeur. The deceased went to the city of Columbus to his place of business, spent the day, and returned late in the afternoon in his car to his home. There was testimony on behalf of defendant to show that deceased was under the influence of intoxicants to some extent and testimony to the contrary on behalf of the state. The proof showed that the deceased was addicted to the use of morphine.

The killing occurred just after supper on the evening of May 18, 1922, and there was no eyewitness to the killing; the shooting occurred in the bedroom of the deceased. The only testimony with respect to the actual res gestæ was the dying declaration of the deceased, testified to by several witnesses and the testimony of the defendant.

There was evidence describing the locus quo, and diagrams of the room in which the killing occurred were introduced in evidence, and these appear in the record.

The testimony for the state, connecting the defendant with the killing, was the dying declaration of the deceased repeated in varying forms as testified to by a number of witnesses. The substance of the dying declaration was that the deceased was going into his bedroom and that the defendant shot him in the back from a closet and that he turned and grappled at the pistol, but was so weak he could not hold it and after he turned it loose the defendant kept shooting him. There was evidence of five bullet wounds in the body of deceased, and also evidence as to the places in the room where various bullets struck.

The evidence of the defendant tended to show that as she was passing through the deceased's room he pointed the pistol at her, saying he was going to kill her and then kill himself; that she rushed to him and he shot the pistol once, and she grappled at it after the deceased fired; there was a struggle and the pistol fired rapidly during the struggle; that she and the deceased both had hold of the pistol and were struggling over it; that after it ceased firing she jerked the pistol and ran out and pulled the door to; that in the fight she received a wound on the thumb and finger of her right hand. Controversies had arisen between the defendant and the deceased with reference to their property rights, both of them having property of separate ownership.

The insistence of the state was that the defendant began the trouble or shooting, surprising the deceased in his own room and shot him to death without any provocation. The defendant's insistence was that the deceased began the shooting, and the defendant rushed to him, grappled with him for the pistol, and in the scuffle and struggle the pistol was discharged and some of the bullets entered the body of the deceased, causing his death.

[1] Dr. Elrod, who was examined as a witness for the state, and testified to the different wounds on the body of the deceased, and had testified that a bullet entered the upper part of the arm, was asked the following question by counsel for state: "From your experience in examining wounds of that sort and character, and as a practicing physician, would you say that wound indicated from which direction it was fired, whether from the front or rear?" Over the timely objection of defendant the witness answered, "I would say it wasn't fired from the front." Motion to exclude the answer was overruled. The witness had testified that he was not an expert on the question as to the direction from which shots were fired. He was a medical expert only.

In McKee's Case, 82 Ala. 32, 2 South. 451, Dr. Owen, a physician who dressed the wound of deceased after describing the wound was asked for his medical opinion as to whether the wound was given by a person standing in front of the deceased or be-

hind him, and Chief Justice Stone, speaking for the court, said:

"The opinion of the witnesses, based on the appearance of the wound, that the blow was inflicted from the front, and not from the rear, was properly excluded. The wound was susceptible of description; and it was properly left to the jury to determine from what direction the blow came." Walker v. State, 58 Ala. 393; Bennett v. State, 52 Ala. 370.

In the instant case the matter about which the opinion of Dr. Elrod was sought was an inference from facts which it required no peculiar skill or particular fitness to solve, and which it was the province of the jury alone to determine. There is no appreciable difference between the opinion asked for and a request for the witness' opinion as to whether the defendant fired the shot from the rear. It was proper for the witness to describe the wounds, and for the jury to draw the inference as to the direction from which the shot was fired. The opinion of the witness was inadmissible, and the court erred in permitting the testimony.

[2, 3] The evidence showed that the deceased was mortally wounded and made certain statements to Dr. Elrod and others, under circumstances which showed that he was conscious of impending death. Dr. Elrod, a witness for the state, was allowed to testify over objection of defendant that deceased said, "I want some hot clothes laid over my stomach." "I'm hurting so bad." "Hot clothes are sometimes good to ease pain."

It was not shown just how long after the shooting the declaration was made. The doctor had been called to attend the deceased and had gone from his home to the home of the deceased.

"Acts and declarations, to be admissible under the principle of res gestæ, must be substantially contemporaneous with the main fact under consideration, and so closely connected with it as to illustrate its character." Johnson v. State, 94 Ala. 35, 10 South. 667; Fonville v. State, 91 Ala. 42, 8 South. 688.

The declaration of deceased was not so intimately connected in time with the shooting as to constitute part of the transaction or to illustrate its character. It was not of the res gestæ.

[4, 5] It is essential to the admissibility of dying declarations that at the time they were made the declarant should have been in actual danger of death, that he should then have had a full apprehension of his danger, and that death has ensued. Dying declarations to be admissible must relate to the facts and circumstances of the shooting, and are admissible to prove any relevant fact embraced in the res gestæ of the killing, if the deceased would have been authorized to testify to it if he had lived and been present at the trial. Oliver v. State, 17 Ala. 587, Walker v. State, 52 Ala. 192. Dying declara-

tions are limited to the act which caused death or the crime and the res gestæ. Pulliam v. State, 88 Ala. 1, 6 South. 840.

[6, 7] The statements called for were not part of the res gestæ of the shooting, did not relate to the facts, but related to the suffering of deceased and his desire for relief from pain, shed no light on the shooting, and were inadmissible. But error in admitting such testimony was harmless, and will not work a reversal.

[8, 9] That portion of the testimony of Tom Humber as to dying declaration of deceased, "that he wanted me to remember," and "that he wanted me to distinctly remember," was inadmissible, and the court erred in refusing to exclude it. The dying declarations testified to by certain witnesses, that "she shot me like a dog," "she did her very best, the old heifer," and other similar expressions, were inadmissible; but objection was not made on the trial, and cannot be raised for the first time here.

[10] Dr. Elrod, a witness for the state, was asked on cross-examination if he did not make certain statements on the preliminary trial of the defendant, and to refresh his recollection counsel for defendant read from the transcript of his testimony on the preliminary hearing.

"The testimony of a witness, on the preliminary examination of the defendant before a committing magistrate, having been reduced to writing and subscribed, and being produced in court on the trial, he cannot be cross-examined as to particular parts, or garbled extracts from it, without allowing him to read or hear the entire deposition; nor can the deposition itself be treated as original evidence, or received for any other purpose than that of contradicting or impeaching the witness, and the court may so instruct the jury." Kennedy v. State, 85 Ala. 326, 5 South. 300.

"When it is sought to impeach a witness by showing discrepancies between his testimony and his former statements on the preliminary investigation before a committing magistrate, which were reduced to writing by the magistrate, and, for this purpose, he is cross-examined as to such former statements, it is not proper to read detached portions of them, and ask the witness if he did not so testify, but his entire testimony should be shown or read to him." Wills v. State, 74 Ala. 21; Phœnix Ins. Co. v. Moog, 78 Ala. 310, 56 Am. Rep. 31; Floyd v. State, 82 Ala. 22, 2 South. 683; Carden v. State, 84 Ala. 420, 4 South. 823.

"In Gunter v. State, 83 Ala. 96, 3 South. 600," it was "held that the trial court had properly refused to permit a witness to be interrogated on cross-examination as to particular statements made before a committing magistrate on preliminary hearing, such statements having been reduced to writing, and being then in court in the possession of counsel, but not shown to the witness. It was considered that the court would not undertake to inquire whether the purpose of such a mode of examination was to contradict and impeach the witness, or to test, or even refresh, his memory. It is the settled rule in this state, as it is of

nearly all the states, and as it was in England prior to 1854, that the proper and necessary course is to put the writing, where that can be had, in the hands of the witness, and to ask him whether it is his writing or deposition." B. R., L. & P. Co. v. Bush, 175 Ala. 49, 56 South. 731; Wills v. State, 74 Ala. 21; Phœnix Ins. Co. v. Moog, 78 Ala. 310, 56 Am. Rep. 31; Floyd v. State, 82 Ala. 22, 2 South. 683; 1 Greenl. Ev. (16th Ed.) §§ 463–465a, and notes to last-cited section.

The court did not err in sustaining the objection of the state to this mode of examination of the witness.

[11, 12] Defendant's counsel offered to show on cross-examination of Dr. Woolridge that the relations between deceased and the defendant had been good for 10 or 12 years.

Enmity or ill feeling between parties is a fact to which a witness may testify, if he knows it. It is generally made manifest by the demeanor and conversation of the parties; and third persons, observant of, and familiar with, their intercourse, and the state of their feelings, as shown by their conduct and conversation, may testify to it as a fact. It stands in the category of health, sickness, good humor, anger, earnestness, jest. Polk v. State, 62 Ala. 237; McHugh v. State, 31 Ala. 317; Wilkinson v. Moseley, 30 Ala. 562; 1 Brick. Dig. 875, §§ 993, 998, 999, 1007; Holmes v. State, 100 Ala. 83, 14 South. 864; Butler v. State, 16 Ala. App. 234, 77 South. 72; Nelson v. State, 11 Ala. App. 221, 65 South. 844. It was relevant to prove ill will between the parties as tending to show motive for the killing and to illustrate their conduct in the fatal difficulty. It was likewise relevant to prove friendly relations as tending to show absence of such motive and in illustration of the conduct of the parties at the time of the shooting.

[13] The photographs marked Exhibits A, B, C, and D, respectively, were properly admitted in evidence.

[14] There was no error in declining to admit in evidence fragmentary paper writings marked Exhibits 2 and 3, as they were unintelligible and meaningless.

[15] The fragmentary paper writing marked Exhibit 4, contained the name of Leila (the defendant) was shown to be in the handwriting of deceased, and contained the postscript, "I am going to kill her don't breathe to any one."

Olive v. State, 2 Ala. App. 77, 57 South. 66:

"In a case where it was competent for the defendant to introduce evidence of threats made against him by the deceased, it was error for the court to decline to allow him to show by a witness that on the night of the homicide and shortly before the fatal difficulty, and near the place where it occurred, the deceased said: 'I am a g——d d——n black snake. I killed one man over in Mississippi, and I am going to kill another tonight.' And this is true notwithstanding defendant had the advantage of evidence of other threats, since the threats here set forth were entirely independent of such other threat, and made under circumstances rendering it competent and relevant."

It was a matter of inference for the jury whether the deceased made such threat against the defendant, 'and the weight or probative force was a question entirely for the jury. The court erred in not allowing the paper in evidence.

There is no merit in the other exceptions to the evidence.

[16, 17] Charge K was faulty in pretermitting defendant's freedom from fault in bringing on the difficulty. Bluitt v. State, 161 Ala. 14, 49 South. 854. Charge N was properly refused. It singled out the evidence. Councill v. Mayhew, 172 Ala. 295, 55 South. 314; 12 Michie's Dig. p. 474, § 196, and authorities. It was also argumentative and invasive of the province of the jury, and gave undue prominence to certain specific facts. 1 Mayfield, Dig. 168, § 11; 6 Mayfield, Dig. p. 108, § 11, and page 111, § 18.

[18-20] Charge O was faulty in pretermitting defendant's freedom from fault in bringing on the difficulty.

Charge P was properly refused. It pretermits defendant's freedom from fault, is argumentative and invasive of the province of the jury.

Charge R is faulty, in that it ignores a constituent element of self-defense—freedom from fault in bringing on the difficulty—and gives undue prominence to specific facts.

Charge S is argumentative, and pretermits defendant's freedom from fault in bringing on the difficulty, and was properly refused.

[21] Charge T is misleading, does not correctly state the law, and was properly refused.

[22] The argument of special counsel for the state that, "under the theory of defendant's defense, the threats contained in the letter have no probative force," was clearly within the bounds of legitimate argument.

[23] The defendant filed a motion for a new trial on many of the grounds which have been decided in this opinion and on the additional ground that two photographs showing the location of a gate on the premises, though not introduced in evidence, were taken by the jury into the jury room. It appears that these photographs were picked up by mistake and placed with other photographs which were in evidence, and that neither party was responsible for the mistake.

It does not affirmatively appear that the defendant may have been prejudiced by the presence of the photographs in the jury room and a new trial should not have been granted on this ground. Leith v. State, 206 Ala. 439, 90 South. 687, and authorities cited.

For the errors indicated the judgment of the circuit court is reversed and the cause remanded.

Reversed and remanded.