# Hadley v. The State.

## *Indictment for Murder.*

1. *Presumption of malice from use of deadly weapon.*—This court adheres to the principle decided in the case of *Murphy v. The State* (37 Ala. 142), which is supported by all the old writers on criminal law, that in cases of homicide the law presumes malice from the use of a deadly weapon, and casts on the defendant the *onus* of repelling the presumption, unless the evidence which proves the killing shows also that it was done without malice.

2. *When witness may testify to character.*—A witness may be competent to testify as to the character of a person in the neighborhood in which he lives, although he has never heard it discussed; but, if he says that he "does not know his general reputation in the neighborhood," although he has known him all his life, he is not competent to testify as to his character.

3. *Pending civil suits for damages; relevancy and admissibility of.*—On a trial under an indictment for murder, the records of several pending civil suits against the defendants, brought by the widow and next of kin, as the personal representatives of the deceased, and of other relatives who were killed in the same rencontre, are not admissible evidence for the defense, to discredit the plaintiffs therein as witnesses, nor for any other purpose.

FROM the Circuit Court of Baldwin.

Tried before the Hon. H. T. TOULMIN.

The defendants in this case, James Hadley and James M. Hadley, were jointly indicted and tried, together with Jesse Hadley, Thomas Stewart, and Howell Pitcher, for the murder of Green B. Bryars; pleaded not guilty to the indictment; were convicted of murder in the second degree, and sentenced to imprisonment in the penitentiary for the term of ten years, while a verdict of not guilty was returned as to the other defendants. The circumstances attending the homicide, as disclosed by the evidence adduced on the trial, are thus stated in the bill of exceptions:

"There was evidence tending to show, on the part of the State, that the parties lived about seven miles apart in the northern part of Baldwin county, and were stock-raisers; that on the Saturday before the killing they (that is, James Hadley, James M. Hadley, Jesse Hadley, and Green B. Bryars) were together at the house of said Green B. Bryars, and were friendly, and parted friendly, to meet again on Monday morning, and to go to a fork two or three miles from the house, to drive out some sheep belonging to Hadley, and separate them from the sheep of said Bryars. On Monday morning, all five of the defendants came to the fence of one of Bryars's lots, which was near the road leading from, and about one hundred yards from his house. All of them were mounted except one, and all armed with guns, and were *first* outside of the fence, opposite said Green B. Bryars, who stood by his plow, just inside of his lot, where he had been plowing before the defendants came up. Larry Bryars, one of his sons, had been to the house for water, and had just returned to his father, whom he had been helping to plow, as the defendants came up, and was standing outside of the fence, a few steps from his father. Wiley J. Bryars, another son, came from the house towards the place where his father and the defendants were; and when he came within about thirty steps of them, the deceased had left his plow, and got over the fence, and walked a few steps in the direction of the house, when he called out, 'Boys, come here.' This call attracted the attention of John and Joseph Bryars, who were at the house, and of his wife and daughter, Mrs. Elizabeth Bryars and Bettie Bryars, who were in the yard, near the gate. Immediately on the deceased calling for his boys, the defendants dismounted from their horses, and James Hadley, being about five steps from the deceased, leveled his gun at the deceased, and shot him with both barrels. The deceased fell instantly; and about the same time, James M. Hadley shot him with one barrel of his gun, and then shot the other

[Hadley v. The State.]

barrel at Larry, who stood near his father; from which shot
Larry fell. About the same time, all the other defendants
pointed their guns in the direction of Larry and Wiley, who
were in the same direction from the defendants, and fired;
Larry being then down on the ground, and Wiley going to-
wards the house. Wiley was shot in the back of the thigh
and head. The deceased, Green B. Bryars, Larry, and Wiley,
were dressed in their working clothes, were in their shirt-
sleeves, and had no arms or weapons of any sort. The evi-
dence tended to show that the deceased, at the time he was
shot, had in his left hand a small stick, about two feet long,
and an inch and a half in diameter. Very soon after this
shooting, Joseph Bryars started from the house, with his
gun, and had reached within about fifty yards of the defend-
ants, when he was shot in the head, and killed; and the evi-
dence tended to show that he did not fire his gun. John
Bryars was advancing a short distance behind Joseph, with
two guns, and he received a shot in the arm. He immediately
returned the fire, discharging both barrels of his gun, and
turned to get the other gun, which he had put down, when
he received a second shot in the foot. Green B. Bryars,
Larry Bryars, and Joseph Bryars were all killed, and Wiley
and John wounded, in a few moments of time, and within a
short time, not exceeding ten minutes, after the defendants
arrived there. The defendants remounted their horses, and
left in the direction whence they came; and the evidence
tended to show that they went towards the house of James
Hadley, and from there to the woods. One Renfro testified,
on the part of the State, that the defendant Pitcher was in
his employ, getting timber, and came by his camp about sun-
rise on the morning of the killing, and told him 'that he was
going to fight a duel with old man Bryars that morning, and
would be back to his work about twelve o'clock that day';
that said Pitcher then left his camp, with a gun, and went in
the direction of Bryars's house, which was two or three miles
distant. The killing took place about eight o'clock in the
morning.

"There was evidence tending to show, on the part of the
defense, that the defendants were at the house of said Bryars
on the Saturday before the killing, and, in a conversation
between him and James Hadley, reference was made to a
dispute previously existing, about a sheep of Hadley's, which
Bryars said Hadley had accused him of marking; and Bryars
insisted on his retracting the charge, and admitting it to be
a falsehood; while Hadley denied that he had said Bryars
had stolen his sheep, but only that Bryars had made a mis-
take in marking one of his sheep. At the solicitation of

[Hadley v. The State.]

James M. Hadley, they made friends, and parted as friends, and agreed to come Monday morning, and get Hadley's sheep out of 'the fork'; James Hadley saying that he would send the boys, and, Bryars insisting that he should come too, he then consented to come. Immediately after they had left, Green B. Bryars said, in the presence of one Weakley, 'James Hadley seems like he wanted to compromise and make friends; but he can't make friends with me on any consideration, unless he acknowledges that he told a lie on me. He thinks he is coming here Monday to get them sheep, but he can't do it: he either has to acknowledge he told a lie, or fight.' Larry Bryars said to a friend on Sunday evening, when taking leave of him, 'I don't know that you'll ever see me any more. The Hadleys are coming on Monday to get them sheep; but old Jim will have to take back what he said, and admit he told a lie, or there will be a fight,' or 'a fuss.' Joseph Bryars said, on Sunday, that he could not go to the house of one King, his brother-in-law, 'because the Hadleys were coming to the house on Monday morning, and there would be hell.' There was evidence tending to show on the part of the defendants, by three witnesses, that when they started Monday morning, they were prepared and furnished with provisions for two days and one night in camp; that two of them were to drive home some sheep, and the others were after cattle; that Bryars was in the field when they rode up to the fence, and advanced towards them, with a pine root, about two and a half feet long, and one and a half or two inches in diameter, and jumped on the fence with it, calling towards the house, 'Come on, boys,' or 'Come with your guns, boys,' and attacked James Hadley with the stick; and that at the same time, while Hadley was backing his mule out of the way, several discharges of guns were made to and towards the defendants from persons on the premises of Bryars, and James Hadley and James M. Hadley were shot, and the clothes of the other defendants were a good deal cut by shot; and that Green B. Bryars was not shot, nor either of the others, until after this assault and these discharges from the Bryarses, and that twelve or fifteen shots were fired in two or three minutes. There was evidence on the part of the defendants, also, tending to show that Mrs. Elizabeth Bryars, on the evening after the difficulty and the death of Green B. Bryars, made statements of details of the rencontre different from those made by her as as witness on the trial."

"D. C. Byrne, a justice of the peace in said county, who was examined as a witness for the defense, testified, that he is a native of said county, and had known Hadley all his life, who is also a native of the county, and lives about eight

miles from him; that he did not know the reputation of the defendants in the community in which they live, but had never known or heard anything against them, and until this occurrence had never heard his character for peaceableness discussed; that of his own knowledge he knew nothing against them; that James Hadley, so far as he knew, was a peaceable, good man, but he could not say what his reputation for peaceableness was in the neighborhood in which he lived. The court thereupon ruled, on motion of the State, that said witness was not competent to testify as to the character of said Hadley, and excluded his evidence from the jury; to which ruling the defendants excepted."

"When John B. Bryars was offered as a witness on the part of the State, the defendants objected to his competency as a witness, and offered to show that he was a son of the deceased, and a brother of Larry and Joseph Bryars, and had brought an action of attachment in the Circuit Court of said county for $10,000 damages, for an assault and battery on him at the time and place the deceased was killed, against all the defendants, which action was still pending. The court overruled the objection, and allowed the witness to testify; to which ruling the defendants excepted. The defendants offered to prove, on cross-examination of said witness, that he was the plaintiff in a suit against them for an assault and battery committed on him by them, being the same suit mentioned above; but the court sustained an objection to this evidence on the part of the State, and the defendants excepted. The defendants also objected to the examination of Mrs. Elizabeth Bryars, the widow of the deceased, as a witness for the State, on the ground of incompetency, and offered to show that she, as the administratrix of said deceased, had brought an action in said court against all these defendants, for $20,000 damages for the wrongful killing of said deceased, and had also brought another action in said court, as next friend for Wiley Bryars, her son, to recover $10,000 damages for an assault and battery committed on him by them at the same time and place; which said actions are still pending in said court. The court overruled the objection, and allowed the witness to testify; to which the defendants excepted. The defendants also offered to prove these facts on cross-examination of said witness, but the court sustained an objection to said evidence by the State; to which the defendants also excepted." Similar objections were made to the testimony of Wiley J. Bryars, and exceptions duly reserved to the overruling of them. "John Bryars, Wiley J. Bryars, Mrs. Elizabeth Bryars, and Bettie Bryars, were the witnesses for the State who testified as to the facts of the rencontre.

[Hadley v. The State.]

After the evidence for the State was closed, the defendants offered to show the same facts as to said pending suits, claiming $70,000 in all, separately, and all together as to each of them, and to produce the full record in each case, and that their attorneys in said suits were also their attorneys in this case. But the court refused to permit the defendants to prove any or all of these facts, and excluded them from the jury; to which ruling of the court the defendants excepted."

" The court charged the jury, among other things, as follows : ' If one man shoot another with a gun, or other deadly weapon, and death ensues, the law implies, or considers, or presumes, that the act was done maliciously, and imposes upon the slayer the burthen of rebutting this presumption, unless the evidence which proves the killing itself shows it to have been done without malice. Hence, if you believe, from the evidence, that the prisoners at the bar shot Green B. Bryars with a shot gun, or other deadly weapon, and thereby caused his death, the law presumes that the act was done maliciously, and imposes upon the prisoners the burthen of rebutting this presumption, unless the evidence which proves the killing itself shows it to have been done without malice. Now, then, if you believe from the evidence that the prisoners took the life of Green B. Bryars with a shot gun, or other deadly weapon, willfully, deliberately, maliciously, and premeditatedly, as tested by what I have said to you, and you find that it was done in this county, and before the finding of this indictment, they would be guilty of murder in the first degree, and it would be your duty so to find them. Should you find them guilty of murder in the first degree,' etc. To this charge the defendants excepted."

ALEX. McKINSTRY and D. C. ANDERSON, for the defendants, cited the following authorities : 1. As to error in the charge of the court—Wharton's Criminal Law, vol 1, §§ 711, 712 ; Wharton on Homicide, § 671; *Stokes v. People,* 53 N. Y. 164 ; *Ogletree v. The State,* 28 Ala. 701; *Oliver v. The State,* 17 Ala. 587 ; *Martin v. The State,* 47 Ala. 564 ; *Harrington v. The State,* 45 Ala. 82 ; *Maher v. The People,* 10 Mich. 212–25 ; *Hurd v. The People,* 25 Mich. 416.

2. As to the admissibility of Byrne's testimony as to the character of the deceased—1 Phil. Ev. 468–9, 471; 3 *Ib.* 482 ; 22 Ala. 37–41; 31 Ala. 320; 40 Ala. 211 ; 7 Car. & P. 298.

3. As to the admissibility of the records of the pending civil suits, for the purposes for which they were offered—1 Stew. 399 ; 9 Porter, 126 ; 31 Ala. 32 ; 40 Ala. 204 ; 43 Ala. 339 ; 47 Ala. 607 ; 2 Halst. 220, 234.

JNO. W. A. SANFORD, Attorney-General, for the State.

STONE, J.—Mr. Wharton, the able author of the works on Criminal Law, and on Homicide, has contributed an article to the "Forum," April number, 1875, in which he attempts to show that there has been a revolution in criminal law, in the matter of presumed malice. In his work on Homicide, 2d ed., § 671, he asserts the same doctrine, and says, "If it be said that the use of a weapon, likely to inflict a mortal blow, implies, as a presumption of law, in its technical sense, a deadly design, this is an error; and *a fortiori* is it so, when it is said the use of such a weapon implies a malicious design."

Malice, design, and motive, are, as a rule, but inferential facts. They are inferred from facts and circumstances, positively proven. If direct, positive proof of them were required, it could rarely be given. Still, we know they exist; and when sufficient facts are in evidence to justify us in drawing such inference, we rest as securely in the conviction, as if it were forced upon us by positive proof. The measure of evidence, however, to justify such abiding conviction, must be very full,—so full as to exclude every other reasonable hypothesis.

That every one must be held to intend the known consequences of his intentional act, is a recognized canon of moral accountability, and of municipal law. Malice, as an ingredient of murder, is but a formed design, by a sane mind, to take life unlawfully, without such impending danger, to be averted thereby, as will render it excusable, and without such provocation as will repel the imputation of formed design. Hence, when life is taken by the direct use of a deadly weapon, the canon, stated above, comes to its aid; and, if there be nothing else in the transaction—no qualifying or explanatory circumstance—the conclusion is irresistible, that the killing was done pursuant to a formed design; in other words, with malice aforethought; for malice, in such connection, is but the absence of impending peril to life or member, which would excuse the homicide, and of sufficient provocation to repel the imputation of its existence.

In Foster's Crown Law, it is said, "In every charge of murder, *the fact of killing being first proved*, all the circumstances of accident, necessity, or infirmity, are to be satisfactorily proved by the prisoner, unless they arise out of the evidence produced against him; for the law presumeth the fact to have been founded in malice, until the contrary appeareth; and very right it is that the law should so presume." The

same doctrine is affirmed in all the older writers and adjudications on criminal law.

Sir Wm. Blackstone (4 Com. 201) says : "We may take it for a general rule, that all homicide is malicious, and, of course, amounts to murder, unless when justified, excused, or alleviated into manslaughter ; and all these circumstances of justification, excuse, or alleviation, it is incumbent on the prisoner to make out to the satisfaction of the court and jury."

In the case of *Webster v. Commonwealth*, 5 Cush. 206, the case stood on the naked proof of the homicide, without any of the attendant circumstances. Ch. J. Shaw declared the law as above quoted.

The case of *People v. Schryver*, 42 N. Y. 1, is a very careful and full collection and collation of authorities, English and American, and fully sustains the doctrine above declared. See, also, *Tweedy v. State*, 5 Iowa, 433 ; *Silvus v. State*, 22 Ohio St. 90. The case of *Stokes v. The People*, 53 N. Y. 164, properly understood, is not materially opposed to this view. The charge of the judge in that case invaded the province of the jury ; and, in addition to this, the case was made to turn materially on the statutes of New York. The charge in that case went much beyond the principle above copied from the old authors.

The charge in the present case is precisely that which was given in the case of *Murphy v. The State*, 37 Ala. 142. In that case, this court held, that the charge was free from error. We are unwilling to depart from that decision, and, in doing so, from an old landmark which has, for centuries, withstood the test of time, and the combined wisdom of jurists on both sides of the Atlantic. There is a lamentable and growing laxity in the administration of the criminal law, which is seen and deplored by all good men. Life is not sufficiently cared for; its destruction not punished with sufficient severity. Until the reckless and rash are taught, by firm judges and stern juries, that the slayer of his brother can invoke the shield of self-defense, only when, without sufficient provocation from him, his life was in peril, or his body exposed to grievous injury; that homicide by him cannot be mitigated to the lesser offense of manslaughter, unless the jury are convinced that the killing was unpremeditated, and the result of sudden passion, excited by present injury more grievous than words—we fear that the calendar of bloody crimes is destined to know no diminution in its numbers. The terrors of certain punishment are the only sure means of restraining the evil-minded.

2. The evidence offered of the character of the accused

[May v. The State.]

was properly rejected. The witness admitted he did not know the general character of the prisoner in the neighborhood in which he lived. Such knowledge is a necessary predicate to the introduction of evidence of character. 1 Brick. Dig. 513, §§ 910, 914. This knowledge of general character may be acquired, and frequently is, without hearing the subject discussed by a majority of the neighbors. Still, the witness must be able to say he knows the general character, before he can be allowed to speak of it.

3. We can perceive no principle, or reason, why the records of the civil suits, offered in evidence, should have been received. They could not have shed any legitimate light on the merits of the rencontre, which was the subject of inquiry. The verdict and judgment in the prosecution could not be evidence for any purpose in the civil suits. Neither do we think the institution or pendency of those suits, at all affected the credibility of the witnesses. The parties had the clear legal right to bring the several suits; and if they succeed in convincing the juries that the several homicides and assaults were unlawful, they will be entitled to recoveries in their several actions. Otherwise, they must fail. The statutory right to sue would, probably, exert as great a bias on the witnesses, if it exert any at all, as would the pendency of the suits.

There is no error in the record. The judgment of the Circuit Court is affirmed, and the sentence of the law must be executed.