270 So.2d 666

Arenza **THIGPEN**

v.

**STATE.**

I Div. 180.

Court of Criminal Appeals of Alabama.

Dec. 5, 1972.

David H. Coar, Vernon Z. Crawford, Mobile, for appellant.

William J. Baxley, Atty. Gen., and Sarah V. Maddox, Asst. Atty. Gen., for the State.

TYSON, Judge.

The indictment charged that appellant, Arenza Thigpen, unlawfully and with malice aforethought, killed James Perine by shooting him with a gun. Jury trial resulted in a conviction of second degree murder. Verdict and judgment set punishment at imprisonment in the penitentiary for life.

State's witness Preston Goode testified that he was with Perine on the date in question. At about 2:30 p. m., he drove with Perine to Finley's Drugstore, which was located in the Toulminville area of Mobile County. According to Goode, Perine got out of the car with a shotgun in his hand and "yelled something up at Finley Drug Store." Perine then got back in the car with Goode and, after driving once around the block, they parked in front of the Ridge Social Club, located near Finley's Drugstore.

Goode testified that after about ten or fifteen minutes, Arenza Thigpen came out of the drugstore and walked over to where Perine was standing in front of the Ridge Social Club. The two talked for about five or ten minutes, but Goode, who was sitting in Perine's car, was unable to hear what they were saying. Appellant then left, headed in the direction of the drugstore; Perine returned to his car. According to Goode, "He told me to get under the wheel and drive."

Goode and Perine then circled the block in Perine's car and returned to a gas station where Perine got out, still armed with a shotgun. Goode testified that Perine again told him to circle the block, and that

as he was leaving he heard shots, but did not see who fired them.

After circling the block, Goode, then travelling on Driver Street, saw Perine lying on his back near the curb. He stopped, then heard three more shots. Looking in the mirror, Goode "saw Thigpen stick a shotgun out of the back of Noble Beasley's car," pointed in the direction of Perine. Goode then got out of Perine's automobile and shouted, "The man already shot no need to shoot him anymore."

According to Goode, appellant walked up to Perine's body which lay sprawled out on the street and turned his shotgun on him (Goode). Goode stated that appellant told him to get away from there, which he did.

Rudolph Kimbrough, called as witness for the State, testified that he lived near where the incident occurred, and that he came out of his house when he heard shots. He saw a man with a gun, later identified as the deceased, running across a vacant lot; the man was limping. He next saw a blue Cadillac turn around on Driver Street and head toward Costarides Street. A second car then appeared on Driver Street. According to Kimbrough, "The man running across the field tried to get in this car [the second car] and reached for the door and fell." He heard the driver of the second automobile say, "Please don't kill him, he's already down." The witness then testified as to hearing three more shots coming from the direction of the Cadillac, but did not see who fired them. He identified Preston Goode as the driver of the second automobile.

Ella Belle Powell testified for the State that she was in her house on Driver Street when she heard shots; she went outside and saw a man running across Costarides Street toward her house. She stated that the man was not armed; that he was limping. She saw this man approach a parked car on Driver Street, reach for the door, and fall to the ground. She then saw another man with a long barrelled shotgun coming in that direction from the Ridge

Social Club. She stated this man was attired in green pants and a green banlon shirt. She saw the man walk up to the man lying on the ground, say something, and then heard two shots fired in the direction of the fallen man.

Patric Reed, State's witness, testified as follows: that he was eleven years old when this incident occurred; that he lived on Driver Street and was playing with a friend at a neighbor's house when he heard shots; that he saw a man crossing a field and fall down in the street; that he saw a man wearing a green shirt and pants approach the fallen man with a gun; that he heard someone say, "Don't shoot any more," and he heard the man in green say, "I'll shoot you." He saw the fallen man try to get up and then fall back down. He then saw this man point his gun toward the man lying in the street and heard a shot.

Leo Clemmons, fifteen years of age, testified that on the date in question he was cutting grass alongside Finley's Drugstore next to Finley's parking lot. He saw Noble Beasley's car parked in the parking lot. He further testified that he saw a man, later identified as the deceased, crossing Costarides Street with a shotgun; that he (Clemmons) began to run and as he was running he heard a gunshot; that he turned and saw Mr. Finley standing alongside his store pointing a gun at Perine; that there was an exchange of gunfire between Finley and Perine during which time Perine was apparently wounded in the leg. He further testified that as Perine was limping away, he saw Noble Beasley and another man come out of Finley's Drugstore. Beasley got into the driver's seat, and the other man into the back seat. Clemmons stated that he saw a long gun pointing out of the back window of Beasley's car as it drove away.

Ottis Lee Thornton testified that he was coming out of the Ridge Social Club when he heard shots. He saw Noble Beasley driving a blue and black Cadillac on Driver Street. When Beasley turned onto Stanton Road, Thornton heard more shooting. The next thing he saw was a man kneeling or crouching on the ground in an open field. The man had a big red spot resembling blood on his back.

As the man in the field hobbled across the street, Thornton saw Beasley's car reappear and he heard another shot. Thornton further testified that he saw Beasley's car go to the front of Finley's Drugstore; that appellant emerged from the car, loading his shotgun. Appellant ran down Driver Street until he came to Perine's body which was lying in the street. According to Thornton, "I saw Perine's body moving and I saw Thigpen using his foot on his body." Thigpen had a shotgun in his hands at the time.

Amos McCants testified that he heard shots and saw a man lying in the street and another man standing over him. Several other witnesses for the State placed appellant and Noble Beasley in the vicinity at the time the shooting occurred.

Officer Kermit Seals of the Mobile Police Department investigated the killing. On arrival at the scene, he found Perine's body lying in the street. A shotgun and pistol were found next to Perine's body. Another shotgun was at the rear of a 1970 Oldsmobile. Officer Seals stated that he saw the appellant at the scene and observed he was wearing a green shirt.

Officer Walter Pickett also investigated the shooting. He observed a blue Oldsmobile on Driver Street, identified as belonging to Perine. Perine's body was approximately six or seven feet from the front door of the car. He also observed a blue Cadillac in front of Finley's Drugstore and what appeared to be blood on the front seat of the Cadillac.

Officer Pickett further testified that pictures were taken of appellant that day at the police station, and that appellant had on a green banlon shirt and green checked pants in those photographs.

Chief witness for the defense, Benson Washington, testified that on the date in question he had been picketing the Handy Mart Grocery Store; that as he was walking down Costarides Street he saw Perine near the Ridge Social Club armed with a shotgun. He saw a lady driving a Buick automobile drive up to where Perine was standing and get out. Perine told this person, "I'm going to kill that nigger unless God's a gopher." When the woman left, an Oldsmobile driven by Preston Goode pulled up and Perine got in.

According to Washington, the car pulled over to a service station where Perine sat for a while. After a few minutes, Perine jumped out and ran over to a Gulf Service Station. At this time Noble Beasley was apparently walking toward his car and Washington stated he heard Perine shout, "I'm going to kill you, nigger." Another man, identified as appellant, was sitting in Beasley's car.

Washington testified that Perine fired in the direction of the car, and appellant jumped out of the car and ran into the drugstore. The witness further testified that he saw Beasley get a long gun out of his car and fire at deceased. The witness later saw the deceased, Perine, lying on the ground.

One Thomasina Perine Ruffin testified that she saw the deceased at the scene shortly before the shooting, and that he told her "they were after him and that he was going to get them." Perine also told her to leave because there was going to be trouble.

Noble Beasley testified that he first saw deceased on the date in question around 9:00 a. m. Perine had an automatic shotgun with him and drew it on Beasley. Words were exchanged between them after which Perine walked away.

He stated that he next saw Perine about 2:00 or 3:00 that afternoon near the Ridge Social Club; that Perine had a gun and began shooting in his direction; that later that day he was in Finley's Drugstore when he saw Preston Goode drive Perine's automobile into a gas station across the street. At that time appellant was sitting in his (Beasley's) car in front of the drugstore. According to Beasley, Perine began shooting in the direction of his automobile. Appellant jumped out and ran into the drugstore. Beasley began firing at Perine, who ran toward an empty field.

Beasley then went into Finley's Drugstore where he saw appellant grab a shotgun belonging to James Finley and run outside. Beasley stated that he and appellant got into his car and began driving down Costarides Street. As they passed the Ridge Social Club, Perine and the appellant exchanged fire. They then proceeded back to the drugstore. The appellant jumped out of the car and went back to the area where Perine had been shot. Beasley stated that he did not hear any more shots.

Testimony of James Finley substantially corroborated that given by Beasley and Washington. Several other defense witnesses testified that they saw Perine in front of Finley's Drugstore on the date in question, and that Perine had a gun and was shouting something.

Dr. Bryan K. Montgomery, a pathologist, testified that in his opinion death resulted from multiple gunshot wounds, primarily in the chest area; there were also various other wounds on other parts of the body.

I

■ Prior to trial, counsel for appellant made a motion for the District Attorney to divulge "all information in his files and all information he has access to in the files of the Mobile Police Department, Sheriff's Department and Department of Justice, that is beneficial to the defendants."

The trial court acted within its discretion in denying such motion. In Mabry v.

State, 40 Ala.App. 129, 110 So.2d 250, the Court stated:

"This court, in two cases, has held that it is within the discretion of the trial court as to whether a prosecuting officer will be compelled to turn over to the defense written notes made by officers during the investigation of a crime. See Vaughn v. State, 25 Ala.App. 204, 143 So. 211; Bailey v. State, 24 Ala. App. 339, 135 So. 407. See also 156 A. L.R. 345–355 . . . .

"Further, it is the holding of a majority of the highest courts of our sister States that it is not error for a trial court to refuse to order a prosecuting attorney to produce and make available for inspection by an accused statements given by the State's witnesses to the prosecuting attorney . . . ."

The court went on to quote from People ex rel. Lemon v. Supreme Court of State of New York, 245 N.Y. 24, 156 N.E. 84, wherein Cardozo, C. J., observed:

" 'Documents are not subject to inspection for the mere reason that they will be useful in supplying a clue whereby evidence can be gathered. Documents to be subject to inspection must be evidence themselves.' "

Since the rule of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L. Ed.2d 1103, has been rejected by our Supreme Court in Sanders v. State, 278 Ala. 453, 179 So.2d 35, the trial court correctly denied appellant's motion. See also McCants v. State, 282 Ala. 397, 211 So.2d 877; Smith v. State, 282 Ala. 268, 210 So. 2d 826; Henry v. State, 46 Ala.App. 175, 239 So.2d 318.

For the same reasons as above enumerated, appellant's motion "to inspect and copy or photograph any relevant written or recorded statements made by the defendants; to give said defendants the result or reports of physical or scientific tests or experiments made in connection with said cause," was properly denied. See particularly Smith v. State, supra.

II

Nor was it error for the trial court to deny appellant's motion to inspect the minutes of the grand jury. As stated in Bailey v. State, 24 Ala.App. 339, 135 So. 407:

" . . . The nature and character of the notes were such that the solicitor was under no duty to submit or deliver them to defendant's counsel and the court properly declined to require him to do so. The notes were not offered in evidence, and being grand jury notes of evidence containing, as was made known to the court, matters which related to other cases, it would have been improper to have thus divulged this evidence taken before the grand jury. Moreover, the point involved was legally within the discretion of the trial judge and his rulings in this connection are sustained."

Additionally, in Strange v. State, 43 Ala.App. 599, 197 So.2d 437, we find this:

"When the defendant, in effect, asks for the State District Attorney to produce a document, he should at least establish that this State official has such document or a copy thereof in his possession before the trial court will be put in error."

On the basis of these authorities, we find that the trial judge acted within his discretion in refusing inspection of the grand jury minutes.

III

Appellant further filed a pretrial motion to compel the District Attorney to identify and produce the whereabouts of a witness or witnesses who allegedly were eyewitnesses to the incident in question. However, we do not deem the constitutional right to compulsory process in a criminal case to operate in such a manner as to

compel pretrial discovery as to who in fact are witnesses for the State. Rather, the law assumes that defense counsel will act with due diligence so as to have such witnesses as necessary available at trial. Then, by way of compulsory process for obtaining such witnesses, the defendant is secured of a proper presentation of his case at trial. See Veith v. State, 48 Ala. App. 688, 267 So.2d 480, and cases cited.

Moreover, a searching cross-examination is also available to the defense. The record here reveals a thorough and sifting cross-examination of each eyewitness called to testify for the State, and thus we find no prejudicial effect on appellant's rights.

### IV

On March 29, 1971, the day set for trial of this cause, the appellant moved for a mistrial when it appeared that the trial judge had excused several jurors from the venire without the presence of the defendant.

Title 30, Section 63, Code of Alabama 1940, Recompiled 1958, pertaining to the drawing and summoning of a special venire in capital cases, has been interpreted to mean that the defendant must be present and given an opportunity to participate in the selection of the jury for his trial. Crump v. State, 28 Ala.App. 103, 179 So. 392. This requirement has been held mandatory, and its denial to compel a reversal. Lassiter v. State, 36 Ala.App. 695, 63 So.2d 222.

However, the provisions of Title 30, Section 63, supra, have been held to have no application to Mobile County. Rather, the selecting and impanelling of juries in Mobile County are controlled by the provisions of Volume 14A, Appendix, Sections 543(5)–543(16), Code, supra; Gautney v. State, 284 Ala. 82, 222 So.2d 175.

Appendix, Section 543(5), provides as follows:

*"Application of subdivision.*—The provisions of this subdivision shall apply to and be operative only in circuit courts of this state in counties having not less than 200,000 nor more than 400,000, according to the last or any subsequent federal decennial census. (1959, p. 955, § 1, appvd. Nov. 6, 1959.)"

According to the last federal decennial census, the population of Mobile County, Alabama, was 317,308.

Appendix, Section 543(12), provides the following:

*"Irregularities not constituting grounds to quash venire.*—It shall not be a ground to quash the venire or to continue any case of the kinds referred to in this subdivision that the sheriff has failed to summon any of the jurors drawn for service during the week in which said case is set for trial, or that any of the jurors summoned have failed or refused to attend court, or that there is any mistake in the name of any juror summoned, *or that a judge, either in open court or otherwise has, for any cause, excused any juror summoned for service for the week in which said case is set for trial.* (1959, p. 956, § 8, appvd. Nov. 6, 1959; 1961, Ex.Sess., p. 2276, appvd. Sept. 15, 1961.)

*"Note.*—*The 1961 amendment deleted 'with the consent of the defendant' between the words 'has' and 'for' near the end of this section."*

The language embodied in this subdivision is to be found in Act No. 366, approved November 6, 1959, Acts of Alabama 1959, Volume 2, as amended by Act 259, approved September 15, 1961, Acts of Alabama 1961, Volume II.

In the case of Stewart v. State, 245 Ala. 511, 17 So.2d 871, where the court was operating under a statute made applicable to Jefferson County identical to the one in the case at bar, the Alabama Supreme Court held:

" . . . [W]e do not think the defendant had a right to be present and be heard in respect to the excuses of jurors

presented to the judge organizing the jury for that week in view of the law which has application to Jefferson County in the trial of such cases; nor that the principle of Stinson v. State, 223 Ala. 327, 135 So. 571, and Smallwood v. State, 235 Ala. 425, 179 So. 217, is here controlling."

We find this authority determinative under the facts of this case.

See also Brewington v. State, 19 Ala. App. 409, 97 So. 763, where we find the following pertinent language:

" . . . This court has consistently held that, where the conviction is for a lower degree of the crime charged in the indictment, rulings of the court affecting and relating solely to the higher crime, or which, by a conviction for the lesser, the defendant was acquitted, would, if error, be without injury under Supreme Court rule 45 . . . . "

## V

The trial court did not err in overruling a motion by counsel for appellant that he be allowed to examine each prospective juror outside the presence of the other jurors. Jurors may be qualified on voir dire in groups at the discretion of the trial court. McPhearson v. State, 271 Ala. 533, 125 So.2d 709; Seals v. State, 282 Ala. 586, 213 So.2d 645, and cases cited therein; Brown v. State, 45 Ala.App. 391, 231 So.2d 167.

## VI

The peremptory striking of the names of eleven Negroes on the petit jury venire by the district attorney was not error. As stated in Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed. 2d 759:

" . . . [W]e cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. . . . "

"In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it. Hence the motion to strike the trial jury was properly denied in this case."

We cannot therefore conclude that in this particular case there has been a denial of equal protection of the law. See also Seals v. State, 282 Ala. 586, 213 So.2d 645.

## VII

Several of the grounds alleged in support of appellant's motion to quash the venire were: (1) that the venire did not represent a venire representative of the community; (2) that Negroes were systematically excluded from the venire; and (3) that persons between the ages of 21 and 31 were systematically excluded and substantially underrepresented in said venire.

The evidence in support of said motion was as follows:

Thomas H. Haas, Mobile attorney, testified that he had seen all of the juries impanelled in Courtroom One in Mobile since September of 1970 (this being March 29, 1971), and that the vast majority of them

were over thirty. He did state that in the past several months there had been a noticeable increase in younger jurors.

John Coleman, another Mobile attorney, testified that he had been specifically observing the ages of persons on jury panels for about a year; that he had never seen more than ten or twelve jurors out of a panel of approximately 100 who appeared to be under thirty years of age. It was his opinion that the Jury Commission of Mobile County had made no effort to put the names of people from twenty one to thirty years of age in the jury box.

The State presented Mary Melton, Clerk of the Jury Commission for Mobile County, who testified that it was her duty to secure prospective jurors; that she did this through personal contacts and sending out questionnaires; that she determined names for the questionnaires by using license tags, city directories, telephone books, tax records and voter lists; that over the last six months, 395 additional names of persons ranging in age from twenty one to twenty nine were placed in the jury box. Prior to adding these new names to the jury box, she had mailed out 2,809 questionnaires from which 2,010 names were added to the jury box.

Out of that number, 24.35% were Negroes and 19.75% were under thirty years of age. She did not know the composition of the entire jury box, comprised of 24,288 names.

Mrs. Melton further testified that since she had been the clerk, she had mailed five sets of questionnaires to both blacks and whites, and an additional one exclusively to aid in obtaining additional Negro names. She also testified that she personally contacted several Negroes in an attempt to increase the percentage of Negroes on the jury roll. She had also contacted responsible Negro leaders about the matter and asked their aid. Further, the Jury Commission had operated a booth at the Greater Gulf State Fair in an attempt to secure prospective jurors.

Mrs. Myrtle Trott, Deputy Administrator in charge of the Criminal Division for Mobile County, testified that she assisted the court in impanelling juries. Mrs. Trott stated that since December 8, 1969, she had kept a record of the number of black and white jurors; that the percentage of white was approximately 67%, and the percentage of Negroes approximately 33%.

■ In the first place, it is now quite clear that a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him, nor on the venire, or grand jury which indicted him. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

We feel that the applicable rule of law is to be found in Junior v. State, 47 Ala.App. 518, 257 So.2d 844, cert. denied 288 Ala. 744, 257 So.2d 852, as follows:

"The appellant's contention in this case must be grounded upon proof that Negroes [and those persons between the ages of twenty one and thirty] have been the victims of improper discrimination and exclusion from jury service in the jury selection process. But purposeful discrimination must be ·proven and may not be assumed or merely asserted, and the quantum of proof necessary to establish such fact is a matter of federal law. Swain, supra."

■ Here, the record clearly fails to show a lack of good faith on the part of the jury officials to obtain qualified Negroes for jury service. There is no evidence that the Jury Commission was influenced by racial considerations, nor that different standards of qualification were applied to the Negro or young persons in the community. In sum, there is no evidence to indicate that prospective jurors to fill the jury roll were selected on the basis of anything other than their individual qualifications. See Swain, supra; Butler v. State, 285 Ala. 387, 232 So.2d 631;

White et al. v. State, 48 Ala.App. 111, 262 So.2d 313.

The trial judge therefore correctly denied appellant's motion to quash the jury venire on these grounds. Jackson v. Morrow, 5 Cir., 404 F.2d 903.

### VIII

Another ground urged in support of appellant's motion to quash the venire was that the venire list drawn for the week of March 29, 1971, did not correctly state the occupation, place of business and residence of 20% of the persons comprising the venire.

 We are of the opinion that where it does not appear that prejudice has resulted, clerical or ministerial mistakes do not furnish sufficient ground to quash the venire. Parker v. State, 266 Ala. 63, 94 So.2d 209; Ziniman v. State, 186 Ala. 9, 65 So. 56; Spooney v. State, 217 Ala. 219, 115 So. 308.

A possible solution was suggested in Irwin v. State, 220 Ala. 160, 124 So. 410, i. e., a short postponement, if justice required it, in order to have the venire list corrected. No such motion was here made.

### IX

As witness for the State, Officer Walter Pickett of the Mobile Police Department was allowed to state his opinion as to the angle at which a bullet struck the deceased in the neck, just below the jaw. From the record:

"Q Did the bullet appear to come at the man from a straight angle as to the hole that you found under his jaw?

"MR. CRAWFORD: We object.

"THE COURT: Overruled.

"MR. CRAWFORD: We except.

"A No sir. It did not.

"BY MR. SIMS:

"Q Then what angle did it appear to come from in your opinion?

"A It appeared to come at a downward angle.

"Q It came up into the jaw, is that right?

"A Into the jaw.

"Q It did not come straight into the jaw?

"A No sir."

 The law is clear in Alabama that a nonexpert witness is not to be allowed to state his opinion as to the direction a bullet travelled before entering the deceased's body. McKee v. State, 82 Ala. 32, 2 So. 451; Humber v. State, 19 Ala.App. 451, 99 So. 68. However, the record here discloses that Officer Pickett was possessed of knowledge beyond that of the ordinary man in this field. His testimony was that he had been on the police force for twelve years and had had occasion to examine more than 150 gunshot wounds.

Further, the record reveals that there were three eyewitnesses to the shooting who saw someone standing over the deceased, who was lying on the ground, and fire at least one shotgun blast in his direction.

Additionally, it was the opinion of Dr. Bryan Montgomery, a pathologist, that his examination of bullet fragments found in the top of deceased's head indicated to him that it was "unlikely that deceased was struck by a bullet directly from the front, but rather at approximately a 180° angle."

Consequently, even if Officer Pickett was not qualified as a ballistics expert, we deem his testimony as cumulative in effect and nonprejudicial to appellant's rights in view of Dr. Montgomery's testimony and the eyewitness accounts of the shooting.[1]

---

1. In Padgett v. State, 49 Ala.App. 130, 269 So.2d 147, cert. denied Nov. 16, 1972, 289 Ala. 749, 269 So.2d 154, recently decided by this Court, it was held

## X

■ At one point during the trial, defense counsel moved for a mistrial, alleging he had discovered that State's witness Ella Belle Powell had been seen in the courtroom on the morning of the afternoon that she had been called upon to testify. The rule had been invoked as to the witness. Defense counsel further moved to strike the testimony given by this witness.

In arguing his motion to the court, defense counsel presented two witnesses, one Rufus Riggsby and one William Dotch, who stated that they saw Mrs. Powell in the courtroom while the trial was in progress prior to her giving any testimony.

Ella Belle Powell took the stand and denied having ever been in the courtroom or having heard any of the proceedings of this cause prior to testifying. She stated that when she arrived at the courthouse on the date she was to testify, she went directly to the district attorney's office in the courthouse where she remained until approximately 4:30 p. m., when she was called to testify.

The motions by defense counsel were denied, with the trial judge intimating to the district attorney that he instigate perjury proceedings.

We find no abuse of discretion by the trial judge in this matter, especially in view of prior holdings that it is within the discretion of the court to allow a witness who has violated the rule to testify. Moulton v. State, 19 Ala.App. 446, 98 So. 709.

that reversible error was committed in allowing a police officer to give his opinion as to the direction from which a bullet had travelled.

The present situation is distinguished from *Padgett* in the following aspects: (1) In *Padgett*, no predicate of any kind qualifying the police officer was laid prior to admitting such testimony; (2) There were no eyewitnesses to the shooting in *Padgett*; (3) The testimony given in *Padgett* was of critical significance; here, it was cumulative in effect; (4)

## XI

■ Appellant contends that the trial court was in error in refusing to allow defense witness Reginald Wilson to testify as to alleged threats made by the deceased against appellant.

Reginald Wilson was the first witness to testify for the appellant, and at this juncture in the trial, no evidence had been adduced as yet to warrant a finding that appellant was acting in self-defense. The evidence had tended to show aggressive retaliation on the part of appellant, rather than strictly defensive measures being taken.

In this state of the evidence, we find no error in the court's ruling. Boyd v. State, 37 Ala.App. 429, 71 So.2d 119.

## XII

On direct examination of defense witness Onley Lucious, the following occurred:

"Now, I ask you whether or not you saw—withdraw that. How long have you known Jimmy Perine?

"A I have known Jimmy quite some time, because we grew up together.

"Q Grew up together?

"A That's right. Until I moved to Missouri.

"Q Uh huh. Do you know,—do you have an opinion as to the reputation of Jimmy Perine in the community in which he lives?

There was an obvious prejudicial effect from the admittance of such evidence in *Padgett*; here, we find none; (5) Here, Officer Pickett's testimony is largely a description of the character of the wounds from personal observation, Reid v. State, 181 Ala. 14, 61 So. 324, while in *Padgett* the police officer went further and drew his conclusion for the jury as to the relative position of the parties at the time of the shooting. Richardson v. State, 204 Ala. 124, 85 So. 789.

"MR. BUTLER: I object, Your Honor. Immaterial, improper predicate and to the form of the question.

"THE COURT: Sustain the objection."

■ We do not feel the exclusion of the testimony of this witness was erroneous, as the form of the question was bad in two aspects. First, before a witness testifies to another's general reputation, he must testify that he *knows* such general reputation, Hadley v. State, 55 Ala. 31; Thornhill v. State, 14 Ala.App. 647, 72 So. 297, or think he knows such general reputation, Carter v. State, 226 Ala. 96, 145 So. 814. Here, no such predicate was laid.

Second, in proving a person's general reputation, the question should be directed to the "general reputation" or "general character" of such person. Way v. State, 155 Ala. 52, 46 So. 273; Rector v. State, 11 Ala.App. 333, 66 So. 857; Dees v. State, 18 Ala.App. 133, 89 So. 95; Gray v. State, 21 Ala.App. 409, 108 So. 658; Harmon v. State, 22 Ala.App. 288, 115 So. 67; Austin v. State, 32 Ala.App. 371, 26 So.2d 424. Failure to use the word "general" before "reputation" is improper. See McElroy, Law of Evidence in Alabama, 2nd Edition, Volume 1, § 26.02(4). We feel this to be the better rule.

## XIII

■ On direct examination, defense witness Benson Washington testified that on the date in question he saw the deceased, Jimmy Perine, armed with a shotgun. He identified State's Exhibit No. 7 as being similar to the shotgun he had seen in Perine's possession. On cross-examination, it appeared that the Assistant District Attorney had in his possession and used for the purpose of cross-examining this witness a transcript from a former trial in which this witness had testified. The witness was asked whether or not at the former trial he had been unable to precisely identify the deceased's weapon. Before this question was asked the witness was allowed time to examine the transcript containing his former testimony.

At this point, an objection was interposed by defense counsel that no predicate had been laid for impeachment purposes, and defense counsel further moved to examine the transcript before the witness was questioned from it.

We feel that a proper predicate was here laid, the witness' attention having been directed to the time, place, and circumstances relating to the allegedly contradictory statement. The trial court therefore correctly ruled in allowing such question be asked of defense witness for impeachment purposes.

Inasmuch as here, the inquiry related only to an allegedly inconsistent statement made at a former trial—no attempt having been made to offer the transcript into evidence, i. e. as original evidence, but merely for purposes of impeachment—it was not error to deny defense counsel's motion to examine the transcript, the witness himself having previously examined it. Bailey v. State, 24 Ala.App. 339, 135 So. 407; Manning v. State, 217 Ala. 357, 116 So. 360.

## XIV

■ The oral charge of the trial court fully and correctly stated the principles of law affecting all material aspects of the case. Some of the refused charges related to the doctrine of self-defense. The court fully charged the jury as to the elements of self-defense, and appellant was not entitled to have this done again in different language. Sanders v. State, 242 Ala. 532, 7 So.2d 483.

Appellant's refused charge No. 7 was properly refused as it was abstract, there being no evidence of appellant's character.

In our view, the other refused charges which asserted correct legal principles were fully covered in substance either in the court's oral charge or other given charges, and no error can be predicated thereon. Title 7, Section 273, Code of Al-

abama 1940, Recompiled 1958. Brooks v. State, 248 Ala. 628, 29 So.2d 4; Vann v. State, 207 Ala. 152, 92 So. 182; Ward v. State, 242 Ala. 307, 6 So.2d 394.

We have examined the objections made during trial in accordance with our duty under Title 15, Section 389, Code of Alabama 1940, Recompiled 1958, and find no errors therein. The record here is in Two Volumes, containing 814 pages. The evidence being ample in its tendencies to support the verdict and judgment of guilt, this case is due to be and the same is hereby

Affirmed.

All the Judges concur.