Robbery; ten years.
Officer George B. Campbell of the Birmingham Police Department was working on an anti-robbery task force in the downtown area on the evening of September 18, 1979. Officer Campbell was a decoy on this task force; he was dressed in a Miller beer salesman's uniform and had a "trucker's wallet" attached to his belt. Officer Campbell was also equipped with a body transmitter so he could signal for assistance. At approximately 11:30 p.m. that evening, between 2nd and 3rd Avenue North around 8th Street, Officer Campbell was staggering around in an effort to give the appearance he was intoxicated. He was not, in fact, intoxicated but was feigning that condition.
While Officer Campbell was leaning against a dumpster acting like he was drunk, he was approached by a black male approximately 5'11", weighing 160 pounds, wearing light brown pants and a dark silky-type shirt. This individual asked Officer Campbell if he was "all right" and then put his hand on Campbell's back. He next shoved Campbell on his back, grabbed Campbell's wallet and broke it before stomping Campbell's leg and running behind the dumpster. The wallet contained about thirty dollars in marked bills and a *Page 165 
"bunch of play money." The marked bills had been placed in the wallet by Sergeant Ed Cousins of the Birmingham Police Department. Officer Campbell further testified that the individual who grabbed his wallet ran toward a white over white Riveria automobile and entered the vehicle. Two minutes prior to the robbery Campbell had seen this individual leaning against the driver's side of the Riveria talking to the driver of the car. The car was parked when Campbell "staggered onto the scene" and observed this conversation.
As Officer Campbell's assailant entered the Riviera, Campbell yelled the code phrase "Come back with my money," to inform the other officers assigned to the detail that the robber had not used a weapon. Campbell stated that when he "didn't hear or see any of our people moving in . . . I said, `Halt, I'm a police officer.'" He then saw a "muzzle flash" from inside the car and a "gunshot come from it." Campbell stated that he "tried to return fire. I got one shot off. They hit 3rd Avenue, West and went back west. About that time one of our pursuit cars got behind it." Officer Campbell saw the Riveria five to ten minutes later in Ensley after it was finally stopped. He identified his assailant at the scene and also pointed out appellant as the other suspect who was in custody at the time.
Officer David L. Rogers of the Birmingham Police Department testified that he and his partner were in plain clothes and drove an unmarked car on the night in question. Shortly after being told to be on the lookout for a white Riveria occupied by two black males, Officer Rogers heard two gunshots fired at close intervals and saw the Riveria pulling out of a driveway onto 3rd Avenue. As they passed the Riveria Officer Rogers leaned out his window and ordered the vehicle to halt. "I said, `Halt, police officers.'" The Riveria continued traveling at a high rate of speed and Officer Rogers fired four shots at the vehicle as it "bounced" onto 3rd Avenue after he had seen the passenger of the Riveria with something in his hand. Officer Rogers stated that he and his partner never lost sight of the Riveria during the entire four to five mile pursuit. He testified that they stayed one and one-half to two car lengths behind the vehicle. Officer Rogers testified that during the chase two marked cars with "lights on and everything" pulled out and tried to set up roadblocks, but that the Riveria "swerved around and kept on going." Officer Rogers stated that he was finally able to fire a shotgun into the door of the Riveria "trying to slow them up," before the vehicle finally "whipped around into a service station" and stopped in front of another police car. Rogers stated that he was the first officer up to the Riveria after it was stopped. He made an in-court identification of appellant as the driver of the vehicle. Officer Marvin Cobern's testimony was similar, in pertinent part, to that of Officer Rogers'.
Sergeant Edward M. Cousins testified that on the night in question he gave Officer Campbell thirty dollars in legal currency and a stack of play money. Prior to giving Officer Campbell the money, Sergeant Cousins copied the serial numbers of the bills and dated the time the serial numbers were copied. He saw Officer Campbell place real money and play money in his wallet.
Sergeant Cousins testified that later in the evening a citizen brought some of the marked bills to him on the scene at the intersection of Avenue R and Bessemer Road. These were some of the same bills he had earlier given Officer Campbell.
Mr. Rick Conway testified in substance that he saw two cars traveling down 3rd Avenue, West around midnight on the night in question at a high rate of speed. He was standing beside his car at the time. After watching the two cars drive off Mr. Conway noticed something lying in the grass; it was some of the marked bills of currency. Mr. Conway testified that he gathered the money, got in his car and "drove down the street after the two cars." Mr. Conway drove a few blocks and turned the money over to the custody of the police who were present at the scene. *Page 166 
Officer Donny Todd of the Birmingham Police Department also recovered one of the marked bills of legal currency and several pieces of play money at the 1500 block of 3rd Avenue, West on the night of the robbery.
 I
Viewing the evidence presented by the prosecution in its most favorable light, as we are required, Livingston v. State,44 Ala. App. 559, 216 So.2d 731, we find that the evidence was sufficient to prove appellant's guilt beyond any reasonable doubt. Every element necessary to prove a prima facie case of robbery was firmly established. Robinson v. State,337 So.2d 1382 (Ala.Cr.App. 1976); Golston v. State, 57 Ala. App. 623,330 So.2d 446 (1975); Ala. Code § 13-9-1 (1975). Any conflicts in the evidence were for the jury to resolve. May v. State,335 So.2d 242 (Ala.Cr.App. 1976).
 II
We have carefully examined the trial court's ruling on appellant's pretrial "Motion to Produce or Disclose" in light of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963) and Chambers v. Mississippi, 410 U.S. 284,93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and do not find that the principles enunciated in those cases were violated.
It is within the discretion of the trial court as to whether a prosecuting officer will be compelled to turn over to the defense written notes made by officers during the investigation of a crime. Thigpen v. State, 49 Ala. App. 233, 270 So.2d 666
(1972). It is not error for a trial court to refuse to order a prosecuting attorney to produce and make available for inspection by an accused statements given by state witnesses to the prosecuting attorney or to compel the District Attorney to identify and produce the whereabouts of a witness or witnesses who allegedly were eyewitnesses to the incident in question.Thigpen, supra.
 III
After the jury had begun deliberations it returned to the courtroom and requested additional instructions on the definition of conspiracy. At the conclusion of the court's supplemental instructions appellant excepted to that portion of the instructions which reads:
 "Actually, it is going to be up to the jury, factually, to determine when this aiding, abetting, assisting and encouraging did, in fact, occur. When it did, in fact, occur. . . ." (R. 366)
Appellant's exception was generally stated and no specific grounds for the exception were assigned.
We have reviewed the supplemental instructions as a whole and find that they were full and comprehensive. We therefore find no error which would require a reversal of this cause from that portion of the charge about which appellant complains. The trial court's oral charge must be considered and construed as a whole and in connection with the evidence, and if, when so construed it asserts a correct proposition applicable to the evidence, a disconnected part or sentence is not reversible error. Van Antwerp v. State, 358 So.2d 782 (Ala.Cr.App.), cert. denied, 358 So.2d 791 (Ala. 1978). Moreover, for an exception to be availing, the accused must separate the bad part of the charge from the good part. Treadwell v. State, 168 Ala. 96,53 So. 290 (1910). An exception must be specific. Garner v. State,53 Ala. App. 209, 298 So.2d 630 (1974).
 IV
Appellant argued in his Motion for New Trial that the state impermissibly used its peremptory strikes to systematically remove blacks from the jury. Appellant is black and the victim in this case is white. Appellant's jury was comprised of eleven whites and one black. At the hearing on the motion for new trial appellant called five lawyers who were experienced in the practice of criminal law in the Birmingham Division of Jefferson County. Two of these *Page 167 
five criminal defense lawyers had at one time been employed as prosecutors in the district attorney's office in Birmingham.
Their testimony in substance was, that over a period of several years in criminal cases where the accused was black and the victim was white, that the prosecuting attorneys from the district attorney's office had a pattern of utilizing their peremptory strikes to remove black prospective jurors. It was admitted by these attorneys that there were exceptions to this practice. One of the defense lawyers also admitted that in cases involving a black defendant and a white victim he tended "toward striking whites as opposed to blacks."
There was no official policy, written or otherwise, at the district attorney's office which required or suggested that black prospective jurors be struck in cases where the accused was black and the victim was white. In fact, the contrary official policy existed. Mr. George Jones, one of the defense lawyers testifying who had formerly been a prosecutor, stated that Jefferson County District Attorney Earl Morgan's "policy was that blacks were not to be removed from petty (sic) juriesjust because they were black. He made that statement on several occasions at staff meetings and generally passing through the office discussing the matter when it would raise its head." (Emphasis added)
Miles Huffstutler testified that he worked in the district attorney's office from 1974 to 1978 and that at no time during those years did he operate on the basis of using race as the sole basis for exercising his peremptory challenges. "To my knowledge there was no policy stated or unstated that anyone in the district attorney's office would use that as the sole basis."
Tommy Nail of the district attorney's office, one of the prosecuting attorneys in the instant case, presented statistics from the records of his cases. His records represented a compilation of cases he had tried during a time frame of more than a year. Upon review of these records as evidenced by Mr. Nail's testimony, it is clear that Mr. Nail did not exercise his peremptory strikes to systematically exclude blacks from the jury in cases involving a black defendant and white victim. Several of Mr. Nail's records bear this out. Mr. Nail testified unequivocably that it was not his practice or policy as a deputy district attorney to strike blacks from juries solely on the basis that they were black.
Pete Johnson also testified that he had worked in the district attorney's office from 1974 to 1979 before entering private practice. During this time Mr. Johnson testified that there was no policy by the office to exercise peremptory challenges to remove blacks from the juries. Mr. Johnson stated categorically that he exercised his peremtory strikes as a matter of trial tactics and not on the basis of race. "I looked for the people I wanted to keep on the jury to be people who were good citizens. . . ."
Based on the foregoing facts we find that the trial court's overruling appellant's motion for new trial was correct. Swainv. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). See also, United States v. Pearson, 448 F.2d 1207 (5th Cir. 1971), and United States v. Carter, 528 F.2d 844 (8th Cir. 1975). A peremptory challenge is defined in State v. Smith,291 N.C. 505, 231 S.E.2d 663, 676, as follows:
 "`Peremptory challenges' allowed each party are challenges which may be made or omitted according to the judgment, will, or caprice of the party entitled thereto, without assigning any reason therefor, or without being required to assign a reason."
Under our law the State as well as the defendant is allowed a certain number of peremptory challenges. Brown v. State,45 Ala. App. 391, 231 So.2d 167 (1970).
In the exercising of this right of peremptory challenges no reason at the time needs to be assigned. The very words "peremptory challenge" indicate an arbitrary and capricious kind of challenge to a certain number of jurors without showing any reason. See Lewis v. United States, 146 U.S. 370,13 S.Ct. 136, 36 L.Ed. 1011 (1892), wherein it is stated: *Page 168 
 "The right of challenge comes from the common law with the trial by jury itself, and has always been held essential to the fairness of trial by jury. As was said by Blackstone, and repeated by Mr. Justice Story: `In criminal cases, or at least in capital ones, there is, in favorem vitoe, allowed to the prisoner an arbitrary and capricious species of challenge to a certain number of jurors, without showing any cause at all; which is called a peremptory challenge; a provision full of that tenderness and humanity to prisoners, for which our English laws are justly famous. This is grounded on two reasons: 1. As every one must be sensible, what sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another; and how necessary it is that a prisoner (when put to defend his life) should have a good opinion of his jury, the want of which might totally disconcert him; the law wills not that he should be tried by any one man against whom he has conceived a prejudice even without being able to assign a reason for such his dislike. 2. Because, upon challenges for cause shown, if the reason assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke a resentment; to prevent all ill consequences from which, the prisoner is still at liberty, if he pleases, peremptorily to set him aside." [Citations omitted]
The reasons assigned in Lewis, supra, for peremptory challenges are equally applicable to the prosecution. It is well known that peremptory challenges are used as a matter of trial tactics to assure fairness by the accused and by the prosecution. The right of peremptory challenge is not a right to select, but a right to reject. U.S. v. Marchant Colson, 12 Wheat. 480, 481, 25 U.S. 480, 6 L.Ed. 700.
As the Michigan Supreme Court observed in People v.Roxborough, 307 Mich. 575, 12 N.W.2d 466, and it is apropros here:
 "If appellant's argument is carried to its logical conclusion, it would do away with the basic attribute of the peremptory challenge, because, if such argument is accepted in all cases involving defendants of the negro race, the prosecutor, upon challenging prospective jurors of that race, would either have to assign a cause for such challenge or take the risk of a new trial being granted on the ground that he discriminated because of color; as a result, no one could safely peremptorily challenge a juror where the defendant was of the same race as the juror. This right, claimed by Roxborough, would extend to members of his race a privilege that is not granted to any other race or class."
The subjective thought processes of a prosecutor in deciding which prospective jurors to reject in any case is beyond, not only the inquiry of opposing counsel, but, the trial and appellate courts as well. U.S. v. Carlton, 456 F.2d 207 (5th Cir. 1972).
No appellate court should attempt to second guess the prosecution's use of its peremptory challenges. Therefore, we hold that the appellant's argument of unconstitutional peremptory challenging is untenable.
We have searched the record and find no error prejudicial to the appellant; therefore, the judgment and conviction by the Jefferson Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.